[No. S027060. June 3, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN DELGADO, Defendant and Appellant.

COUNSEL

Frederick L. McBride for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield and Gary W. Schons, Assistant Attorneys General, Louis R. Hanoian, Garrett Beaumont and Keith I. Motley, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ARABIAN, J.—We determine whether the trial court erred in denying defendant Steven Delgado's motion for a new trial based on a witness's posttrial declaration, and whether the trial court engaged in a prejudicial ex parte communication with the jury. The Court of Appeal found error on both of these bases, and reversed defendant's conviction for second degree murder and misdemeanor child abuse. We disagree and reverse the Court of Appeal.

I. FACTS

A. *Prosecution Case*

1. *Background*

On September 26, 1989, at 7:40 a.m., Elizabeth Ruiz (Ruiz) called "911" to report that she had awakened to find her 11-month-old daughter, Amanda, dead. Sobbing hysterically, Ruiz described her daughter as cold and stiff, and her face black and blue. She did not know what had happened to her. Ruiz also reported an injury to her five-year-old son, Johnnie, and expressed concern that he could not tell her how he was injured. The responding paramedic confirmed that Amanda was dead, with multiple bruising to her face and belly, and dried and caked blood covering her face. Johnnie had a black eye, swollen lips, and blood around the gum line of his teeth and on one ear.

Amanda's autopsy revealed two major skull fractures. Her brain was swollen and showed signs of hemorrhage. Her abdomen was filled with approximately one pint of blood due to laceration of her mesentery, the fatty tissue that anchors the intestinal tract to the backbone, and her liver. There was also bleeding noted in the back of her abdominal and chest walls. She suffered multiple external bruises on her forehead, left cheek area, and right

ear, and internal bruises in the back of her head, her back, and her abdominal wall. She had an abrasion on the left side of her lip, and her frenulum, the structure that holds the upper lip to the gums, was split. Death was attributed to both her massive abdominal bleeding and the swelling of her brain.

The injuries to Amanda's abdominal area were caused by a blunt instrument such as knuckles. The injuries to her head were consistent with being thrown against a wall. The injuries to the mouth were consistent with blunt force trauma caused by a human hand. An analysis of the inflammatory reactions of Amanda's tissue indicated she most likely lived for about eight hours after the assault. However, the time could have been anywhere between six and twenty-four hours.

### 2. Ruiz's Testimony

Ruiz gave conflicting accounts of the events on September 25 and 26, 1989, to the police, in her testimony at the preliminary hearing, at trial, and in her declaration submitted at the hearing on the motion for new trial. On the day Amanda's body was discovered, she told police she had "played no part in Amanda's death." However, her subsequent accounts increasingly tended to implicate either herself or her estranged husband, Manuel Ortiz, and exculpate defendant, demonstrating what defense counsel characterized in closing argument as "her apparent unwillingness to see Steve Delgado convicted of murder."

### a. Trial Testimony

Ruiz lived in a one-bedroom apartment with Amanda and Johnnie. She was separated from her husband, Ortiz, and was dating defendant.

On September 25, 1989, Ruiz fed Amanda and Johnnie dinner at approximately 8 p.m. While the children ate, Ruiz took two sleeping pills.[1] She had not eaten anything all day.

At trial, but not at the preliminary hearing or in her statements to police, Ruiz testified that while the children were eating dinner, she remembered picking herself up off the living room floor. She did not know how long she had been there, and did not remember lying down.

Johnnie went to bed at 8:30 p.m., and Amanda at 9 p.m. Ruiz fell asleep with the children on the bed from approximately 9 to 9:10 p.m.

---

[1] At trial, but not in her prior statements or testimony, Ruiz admitted that as of the time of Amanda's death, she had been taking sleeping pills and nonprescription amphetamines for at least seven months. The jury was also informed that Ruiz took six sleeping pills on an empty stomach prior to her first appearance at trial to testify. (See discussion of Ruiz's hearing testimony, *post*, at pp. 319-320.)

Shortly thereafter, Ruiz received a call from Ortiz, who wanted to see the children. Ruiz said that it was too late and they were asleep. Ortiz then appeared at Ruiz's front door, and repeated his desire to see the children.[2] Ruiz and Ortiz entered the bedroom, looked at the children, and began to argue. They left the bedroom, leaving the door open. Ortiz grabbed Ruiz's arm, and began yelling at her in the hallway. He demanded to know why she was wearing a shirt that said "Delgado." Ruiz fled the apartment for approximately one-half hour because she was afraid Ortiz was going to beat her again as he done previously. Ortiz remained in the apartment, but she did not think that Ortiz had hurt the children, and did not check on the children after he left.

When she returned to the apartment, Ruiz noticed that the frames surrounding certain photographs of her and defendant, and of her and her children, had been broken and strewn about. In response to questions by the district attorney, Ruiz conceded that although she felt so frightened of Ortiz on Monday night that she fled the apartment, she had still been planning to take Tuesday off from work so he could fix her car and visit with their children.

Ruiz then fell asleep in the living room until 10:45 p.m., when she received a collect call from defendant. From the time she returned to the apartment until the time she received the telephone call, she never heard Amanda cry. Defendant, who testified he had spent the evening playing softball and then drinking beer with his teammates, arrived soon after with a pizza. Ruiz slept from the time of the defendant's first call to the time of his second call, asking her to come downstairs and let him in.

At trial, but not at the preliminary hearing or in her statements to police, Ruiz recalled two "cloudy, fuzzy" periods that looked like "dreams" during the evening prior to defendant's arrival. Ruiz testified that from the time she

---

[2]Ruiz conceded at trial that she had not told police on September 26 that Ortiz had visited her apartment the night Amanda was killed. Nor did she testify to the visit at the preliminary hearing. Rather, Ruiz testified at the preliminary hearing that she and the defendant were the only two adults in her apartment that night. Two weeks after the preliminary hearing, on the day that defendant was to be arraigned in superior court, Ruiz told the district attorney that she had lied at the preliminary hearing, and that Ortiz had also been at the apartment the night Amanda was killed. She testified at trial that Ortiz had called her from downstairs on the night of September 25, and apparently told her not to tell anybody that he had been there. Ruiz also testified that she was afraid Ortiz might hurt either her or Johnnie if she said anything. Ruiz was impeached by the fact that while she had not been too terrified at the preliminary hearing to tell the district attorney that Ortiz had threatened her with a gun the night before the preliminary hearing (a story which eventually evolved at trial into a threat by Ortiz that she better testify at the preliminary hearing that defendant killed Amanda "or else"), she had been too terrified to reveal that Ortiz had been in her apartment the night of Amanda's death. In fact, Ruiz did not testify at the preliminary hearing that defendant was the killer.

put Amanda to bed until she received defendant's first telephone call was "all fuzzy to me," and "everything [was] just confused." On cross-examination by defense counsel, Ruiz denied that these "unreal feelings" were something she thought of recently to try to protect defendant, and claimed that she had known about her lack of memory on the evening in question from the time she first visited the police station the day after the attack on her daughter.

At trial, but not in her statements to the police or in her preliminary hearing testimony, Ruiz testified that she now remembered diving into the bed in which Amanda was sleeping sometime prior to receiving defendant's first telephone call. Ruiz was not sure whether the incident occurred before or after Ortiz's visit.

On September 26, Ruiz told police that before she went down to let defendant in, she got her shoes from the bedroom, turned the light on, and saw Amanda blink and turn away from the light. She then covered the children up before going downstairs. She claimed not to recall these statements at trial.

Ruiz and defendant sat talking in his truck for approximately 10 to 15 minutes. Ruiz then drove to the store to get soda, and defendant took the pizza to Ruiz's apartment alone. When Ruiz returned approximately 10 to 15 minutes later, she noticed nothing unusual in defendant's demeanor. She did notice a yellow hairband with two plastic balls, which Amanda had been wearing all evening, in the living room. Ruiz initially told police she had not removed the hairband from Amanda, and gave it to the officers. At trial, however, Ruiz testified that she now remembered removing the hairband.

Ruiz and defendant then entered the bedroom to get her cat from underneath the covers. She observed that the children were covered, and were both located at the head of the bed. Either Ruiz or defendant commented about how cute it was that Johnnie had his arm around Amanda.

Ruiz subsequently noticed a spot of blood on defendant's baseball shirt. He told her he had been hit in the nose with a baseball.

Ruiz asked defendant if Amanda had awakened while she was gone. He said yes, and that he had picked her up, and sung her to sleep with a lullaby. Ruiz and defendant ate some pizza and had sexual intercourse. At some point Ruiz left the apartment for approximately five minutes to retrieve some of defendant's bills from his truck. Ruiz and defendant spent the remainder of the night in the living room, during which time Ruiz did not hear either child cry.

The next morning, Ruiz went into the bedroom, lay down with her children, and fell back asleep. She observed that Amanda was now lying in the middle of the bed, and Johnnie at the head of the bed. She noticed no injuries to either child. Later, defendant looked in the bedroom and said that he was leaving. Ruiz walked him to the living room, and returned to bed.

Ruiz rose for the day at approximately 7:30 a.m. When she returned to the bedroom to help Johnnie get ready for school, she noticed that he had a bloody mouth. He told her that "bad men came through the window." He also said "he fell down." She checked on Amanda, and found her body cold and stiff. She called defendant, and then called "911."

In addition to the above, Ruiz further attempted to implicate herself and exonerate defendant with certain testimony. For example, Ruiz testified that within a few weeks of Amanda's death, she expressed concern to Elizabeth Drysdale, a therapist she had begun to see as a result of custody proceedings regarding Johnnie, that she could not remember certain things from the night her daughter was killed. The jury was also informed that Johnnie was no longer living with his mother.

Moreover, it was revealed to the jury that following Amanda's death, Ruiz maintained a relationship with defendant, and met and talked with him several times.[3] She also visited his attorney's office on numerous occasions, including the day of Amanda's funeral. She asked a prosecution investigator to return one of defendant's shirts to her because she still "cared for the defendant," and talked with defendant's mother more than once to see how she was doing. At the end of his direct examination, the district attorney asked, "Ms. Ruiz, you don't want to see the defendant held accountable for his conduct that night; do you?" She replied, "He didn't do anything that night."

b. *Hearing Outside of the Jury*

When Ruiz first arrived to testify at trial on the afternoon of June 6, 1990, she informed the district attorney that she had modified her story regarding Amanda's death. A hearing was then held in the presence of counsel, but outside the presence of the jury. Ruiz appeared to be under the influence of a foreign substance, and testified at the hearing that she had taken approximately six sleeping pills a little after noon in an effort to commit suicide, apparently prior to testifying.

---

[3]Defendant also testified that he had lunch and dinner with Ruiz on several occasions following Amanda's death, and that on one occasion he had authorized Ruiz to use his automated teller machine card, which Ruiz still had in her possession, to withdraw money from his bank account. He denied that he had any romantic interest in Ruiz after Amanda's death.

Ruiz further testified that she now remembered diving into the bed in which the children were sleeping before Ortiz arrived at 9 p.m. She was not sure whether she hit either one of the children. She did not remember either child crying during this incident.

Ruiz said that she thought Amanda was hurt before defendant arrived. In response to the question, "Liz, do you think you are the one that hurt Amanda?" she responded "Yes." Ruiz stated that she felt responsible for Amanda's death because Amanda was tired when she picked her up, and Ruiz did not remember part of what happened. She stated that she did not remember hitting Amanda other than jumping on the bed. Ruiz testified that she noticed Johnnie had been "smacked hard" the next morning. This colloquy followed: "Who do you think is responsible for that?" "I think I am." "Why do you think that?" "Because I assumed this happened the same time Amanda was hurt." "Why do you assume that?" "I just do." Ruiz suggested that maybe Johnnie had always said that she did not hit him because it was too dark in the room and he could not see.

### 3. *Other Evidence*

Nine-year-old David Cano Yanez lived in the apartment next door and his bedroom abutted that of Ruiz. At approximately midnight on the night in question, he heard a baby crying and a woman saying "Help, Help." "And I heard the walls, that 'Pow, Pow,' and heard voice of the man saying, 'Shhh.' " "And then I heard the pounds of the wall, and I heard the lady saying, 'Help, help. Let me alone. I don't want any problems. . . . I don't want any fight.' " The noise continued for approximately 20 or 30 minutes, after which he did not hear the baby cry again.

Johnnie was interviewed twice by police officers, and once by a therapist. Transcripts of the interviews were submitted to the jury. In the interviews, Johnnie initially told police that he and Amanda were attacked by "a bad man" or "bad guys" that came through the window. An examination of the window had revealed, however, that it was locked, and there were no signs of forced entry. Upon further questioning, Johnnie said his mother had told him to say that a bad man hurt them. Johnnie then identified "Steve," whom he also called "Officer Pete," as the assailant. Johnnie reenacted defendant's attack on Amanda on a videotape that was played for the jury, demonstrating how defendant had beaten Amanda, and eventually left her lying at the foot of the bed.

At times during the taped police interviews, Johnnie reverted to the "bad man" story, but at no time did he implicate his mother. Rather, Johnnie

expressed anger that Ruiz had stayed in the living room either eating pizza or sleeping and "didn't want to protect me and Amanda." "So your mommy just let him hit you and Amanda?" "Yeah." Johnnie said that while his mother had struck him on his hand when he was bad, she had never hit him in the face. Following the taped portion of his first interview with police, however, one officer testified that Johnnie spontaneously stated that he hoped his mother died, and he hoped that they hit his mother. The officer asked Johnnie what he meant by his statement, but he did not respond. When she suggested, "Is it because of what they did to you and Amanda?," he said "Yes."

At trial, defendant, Ruiz, and Manuel Ortiz were all present, but not sitting together, in the courtroom when Johnnie was asked to identify who had hurt him and his sister. Johnnie identified defendant.

Manuel Ortiz testified at trial that on the night before defendant's preliminary hearing, Ruiz "told me everything. She told me what they did and what happened. . . . All she said, she was sorry." Ortiz further testified that he told Ruiz "To tell the truth and stop lying. That it was too late. That everything was out in the open already."

When defendant was asked by a police officer on September 26, "Guess what Johnnie told me?," defendant responded "[t]hat it was me." Defendant further testified that when he looked in the bedroom on the morning Amanda's body was discovered, and said that he was leaving, Ruiz said, "Shhh, you'll wake the kids." Defendant observed that Amanda was now lying at the foot of the bed, and Johnnie at the head of the bed.

Defendant was separated from his wife, Leticia Flores. Defendant called Leticia the night of Amanda's death, prior to calling Ruiz, and asked if he could come over. She said no, because it was too late. Shortly after Amanda's death, defendant told Leticia, "See, Let, if you would have let me come over, all this wouldn't have happened."

B. *Defense Case*

Defendant's trial testimony generally corroborated Ruiz's trial version of the evening's events following his arrival at her apartment. In addition, defendant testified that he never harmed Amanda, and did not notice she was injured that evening.

Rather, defendant attempted to inculpate Ruiz.[4] Defendant testified that he had heard three thuds during the night Amanda died, but that he had not gotten up to investigate. He was impeached with his prior statement to police that he had heard the three thuds, gotten up to look, and everything was all right.

Defendant also testified that it bothered him that Ruiz would let Amanda cry for long periods of time in the bedroom without intervening. On one occasion, he left the apartment because Ruiz was allowing Amanda to cry. He further testified that during an argument with Ruiz on the telephone the night before Amanda's death, Ruiz threw the telephone against the wall and claimed to have thrown a brush because she was upset.

At trial, defendant claimed to have known about Ruiz's drug use, but conceded he had not revealed this information to police when initially questioned. Dr. Kaushal Sharma, a forensic psychiatrist, testified regarding the potential psychotic and violent reactions that can occur in a small portion of the population from habitual amphetamine use over as short a period as a few weeks.

Defense counsel argued at closing argument that "Maybe [Ruiz] is telling the truth as best she can. Maybe she is struggling both with her memory and the awful suspicion or even knowledge of what she, herself, may have done. Maybe. ¶ Maybe, in her struggles with herself and . . . with her guilt of what she suspects or knows about herself, maybe she is unwilling to live with the additional guilt of seeing Steve Delgado convicted. Maybe." "Now the district attorney lays out in this chart for you and indicates that, every time there's some problem of the case progressing through the system, that Elizabeth comes up with some new and startling revelation." The defense attorney then pointed to certain evidence indicating that Ruiz had not recently fabricated these revelations in an effort to exculpate defendant.

Finally, defense counsel, drawing from the coroner's testimony, placed the time of the beating at approximately 8 or 9 at night. He then queried the jury, "What was going on in that apartment at 8:00 or 9:00 at night? Because that's when Liz described her bizarre behavior. ¶ Is that all just a coincidence?"

### C. *Jury Deliberations and Verdict*

On June 27, 1990, the second day of deliberations, the trial judge engaged in a conversation with the jurors outside the presence of counsel. The judge

---

[4]Defendant also attempted to diminish the strength of Johnnie's trial testimony through reference to his inconsistent statements and with expert testimony regarding the suggestiveness of the police interviews of Johnnie, and David Cano Yanez's testimony by noting certain omissions in his statements to police.

promptly informed counsel of this communication and placed it on the record as follows: "As the jurors were arriving, I told them not to worry if the fire alarm went off as they were working on the alarm system and would be testing it. The bailiff had missed the briefing and was unaware of the testing. One of the jurors asked if she could raise a general question not pertaining to the case. I told them I could not answer any question which might relate to the case without talking to the attorneys. She then asked the question of a person charged with rape who had previously been convicted of rape. I told her, and the others present, that the law basically said that was inadmissible as it would cause a jury to conclude a defendant who had done it before had done it again. This could result in a finding of guilt, just because of that and opined that would not be fair. Several jurors volunteered they agreed with this position. One of them asked if a previous conduct (I assumed he meant general deportment) was relevant. I answered that except in specific instances it was not relevant nor admissible."

During the afternoon of that same day, in the third written inquiry received by the court from the jury since the ex parte conversation that morning,[5] the jury asked, "If available, would the prosecution have been allowed to present evidence and/or testimony indicating that Mr. Delgado had a tendency toward violence (for example, similar to that presented concerning Manual Ortiz.)" After consulting with counsel, the court returned a written response to the jury stating, "You must decide all questions of fact in this case from the evidence received in this trial and not from any other source. You are not to speculate as to the existence or nonexistence of any fact not suggested by the evidence."

During the afternoon of the next day, June 28, 1990, defendant moved for a mistrial on the ground that "the information that I believe would have been taken or given to the jurors may well have indicated to them that there could have been evidence damaging to the defendant outside of the evidence, which was, for one reason or another, not admissible or relevant under the law. ¶ I think that, then, allows the jury to speculate that there may well be some fact out there that they were interested in that was not allowed to come into evidence because of some ruling by the court or principle of law. ¶ And I think that the danger is great that such an assumption on their part would have a negative influence on Mr. Delgado's ability to have a fair trial. ¶ They were obviously interested in that issue, in that they have sent a letter

[5]The clerk's transcript reveals that the jury first submitted a written question and received a written response that morning. Neither the substance of the inquiry nor the question itself appears in the record. Defendant has never asserted, however, that this question had any relevance to the ex parte communication. The jury next sent a written request for a reading of the testimony of David Cano Yanez. Finally, at 1:39 p.m., the written question at issue here was sent by the jury.

later in the afternoon asking almost an identical question that was asked earlier to the court."

The motion was denied. The court noted that the jury had been repeatedly instructed not to speculate and that "[t]he answer given in response to the written question was substantially the same as the answer that they secured out of me as they came in that morning."

On the afternoon of June 29, 1990, the jury found defendant guilty of second degree murder and misdemeanor child abuse, and not guilty of assault.

### D. *New Trial Motion—Ruiz Declaration*

On September 27, 1990, over one year after Amanda's death, Ruiz signed a declaration filed in support of defendant's motion for a new trial. She claimed that at approximately 9 p.m. on the evening of September 25, 1989, prior to defendant's arrival at the apartment, she had beaten Amanda severely because she would not stop crying, and hit Johnnie in the mouth when he apparently attempted to intervene. She did not "know that [she] had hurt them so badly until the next morning." "In the morning I was asking Johnnie what happened. I knew what had happened, but I thought maybe he didn't because it was dark. When he said he didn't know I told him to tell the police that two bad men came through the window and did this to he and AMANDA and then left. ¶ I have always thought that John might really know what happened but I don't know. I thought he might identify me in Court. ¶ Everything I have said before this that is inconsistent with this statement is untrue and was said to try to protect myself. I was sure at first that they wouldn't be able to convict Steve because he was innocent. ¶ I am making this statement now because I am having trouble living with this. I need to get out and start over again."

Elizabeth Drysdale, Ruiz's therapist, and Manuel Ortiz testified at the hearing on the motion for a new trial. Drysdale testified that a conversation she had with Ruiz in July 1990 had caused her to submit a "Suspected Child Abuse Report" to the Orange County Child Abuse Registry. The report stated that on the night of Amanda's death, Ruiz "hit Amanda repeatedly and threw her against a wall about 9:00 p.m." "After the incident, Elizabeth held the daughter until she went to sleep, then put her in bed. Elizabeth said she lost her temper with her daughter after the daughter hit her head and began crying. Elizabeth also hit her son on the side of his face when he got up from bed, so he laid back down. One previous incident, about 1 month before, Elizabeth hit her daughter when Amanda was crying."

Ortiz testified that Ruiz told him in July 1990 that she was responsible for Amanda's death. However, on cross-examination he remembered little detail of how Ruiz had accomplished the killing of their daughter.

Defendant also submitted the declaration of Victoria Diaz, a friend of Ruiz's to whom Ruiz allegedly confessed. The declaration stated that Ruiz had told Diaz, "Steve is not responsible, I'm the one who did that." "She stated that she didn't know why her son, Johnny [*sic*], kept saying that Steve did it, except that on the morning of Amanda's death and before the police arrived she told her son to remember to tell the police that Steve was here and she repeated it to him again before the police arrived by saying 'some people are going to come here and ask questions and you just keep remembering to say that Steve was here.' " Ruiz said that Amanda was hurt prior to defendant's arrival, but did not relate to Diaz any details of how Amanda was hurt, although Diaz inquired.

At the hearing on the motion for new trial, defendant's attorney stated that he "would be the first to concede that [Ruiz's] conduct and her testimony have not been so consistent as to inspire any confidence." He also stated, "I would submit, everyone agrees, I think that Ms. [Ruiz] is a disturbed person. And if she is a disturbed enough person to confess, not just to the court, to the defense attorney, but to her therapist, to her husband, and to her friend, Victoria Diaz, if she is disturbed enough to do that, the killing of her child, I suggest that we consider the possibility that she is disturbed enough to have really done it.

The court denied the motion for new trial, stating: "I hope the record reflects . . . [that] both counsel were troubled by the evidence. . . . [B]oth counsel dealt with it with a great deal of honesty and openness with each other. . . . [P]ossibly more than in most trials I have presided over, [this trial] was a search for the truth. And it was a search for the truth occasioned at least in large part by Elizabeth Ruiz and her many varying statements constantly during trial." The trial judge recalled the time Ruiz had appeared to testify in "a loaded condition," and stated, "I don't know where Elizabeth Ruiz comes from. I don't know what her agenda is. I don't know that she knows. I don't know that she at this point is competent to tell us what happened for a number of different reasons."

The trial judge stated that he first was required to determine whether the evidence was in fact newly discovered, and expressed concern that it was not. "What do you do when Elizabeth Ruiz was available and had two contradictory statements and could be cross-examined and was cross-examined? And my impression in the course of the trial, Mr. McBride, was that

you were trying to pin it on her for the jury. She wasn't on trial, and you could shift it on to her. ¶ I thought you did a very good job. The jury obviously didn't. . . . but she was available. And all we have is the latest version in her stories of what happened on that night. ¶ Now, that simply raises, as I indicated, the question of whether this is newly discovered evidence."

The judge then observed that even if the evidence could be fairly characterized as new, the next issue was whether Ruiz's declaration was believable. The judge expressed "serious concerns that it is not," relying in part on the strength of the case against defendant, and the contradictions between Ruiz's declaration and the other evidence presented at trial. The court stated, "Now, maybe Elizabeth did this to herself, but if I exclude what she says in any regard, I still come back to the conclusion that having listened to the evidence I am convinced that the defendant did it and I'm convinced beyond a reasonable doubt that he did it. ¶ Now, do I have some doubts? Can I speculate? Yes, I can speculate; but that's not the standard that we are supposed to apply here. ¶ In listening to defendant and his testimony, I was convinced he incriminated himself by the things in which he said, by the contradictory things in which he said, by the unexplained things, unexplained points that were raised against him; things he could have been expected to answer. The record will reflect them, but I am convinced beyond a reasonable doubt that he did it. And so, even if I don't have what Elizabeth says or if I do have what she says, I disregard what she says because it does not follow with some of the things [defendant] said and the demonstrative evidence which was admitted in this trial." The court also denied a motion for new trial based on its ex parte communication with the jury.

### E. *Court of Appeal Opinion*

The Court of Appeal reversed the judgment both because of Ruiz's posttrial declaration and the ex parte communication between the trial judge and the jury.

In analyzing Ruiz's declaration, the court noted Ruiz's numerous conflicting accounts "culminating in the ultimate recantation, her confession," and stated that the "question we must ask is whether that confession would render it reasonably probable that a different result would occur on retrial." The court recognized that in general, rulings on motions for new trial are left to the discretion of the trial court. The court stated, however, that "it is not for the trial court to determine whether the witness' recantation is true or false, for if this were the case, it would 'render meaningless the right of both the People and the defendant to have a jury determine the ultimate issue of guilt or innocence based upon all of the evidence.' "

The court stated that "the judge did seemingly substitute his judgment for that of the jury. But a confession to murdering one's own child is not to be taken lightly, even from an obviously biased witness. Sure, Ruiz changed her story frequently before. But that is usually thought to be an indication of prevarication and consciousness of guilt. Moreover, it is inherently improbable that a mother would continue a romantic interest in the killer of her baby. . . . Of course, it is improbable that a mother would kill her baby; but that, too, *does* occur from time to time." The court then concluded that "in light of the jury's attempt to reach out for some additional help to decide this matter and the court's errors with respect to that, we think it is reasonably probable that [defendant] might obtain a better result on retrial."

In concluding that the trial court's ex parte communication with the jury was prejudicial, the court reasoned that the jurors' initial inquiry in the hall "should have alerted the court that at least some jurors were speculating as to previous misconduct. And while the content of the court's response was, as a general rule, legally correct, i.e., that evidence of prior misconduct is usually inadmissible, this was an unsatisfactory answer for jurors looking for clinching proof in a difficult case. ¶ When this conversation was followed closely by a written question regarding the admissibility of prior acts of violence by defendant, that should have set off fire alarms with the court. Emergency measures were required; this was the time to tell the jury flatly that the prosecution *would* have been allowed to produce such evidence, if any there was. That is not necessarily an incorrect statement of the law (Evid. Code, § 1101, subd. (b)), and it was essential to put out the flames licking the jurors' imaginations. ¶ . . . From our perspective this was not a strong case, particularly in light of Ruiz' confession of guilt at the motion for new trial. It is impossible to say the error was harmless beyond a reasonable doubt."

The dissent concluded that the trial court had acted within its discretion in denying defendant's motion for a new trial since the trial court had deemed Ruiz's declaration not credible and implicitly found that the introduction of such evidence would not change the result on retrial. The dissent also noted that the facts of this case closely paralleled those in *People* v. *Jennings* (1991) 53 Cal.3d 334 [279 Cal.Rptr. 780, 807 P.2d 1009], in which an ex parte communication was deemed harmless beyond a reasonable doubt. Here, as in *Jennings*, both the oral and written responses of the trial court to the jury's inquiries were correct, and counsel was promptly informed of the ex parte conversation. Moreover, the written response admonished the jury not to engage in speculation. The dissent characterized the further instruction suggested by the majority as potentially misleading.

## II. Discussion

### A. *New Trial Motion—Ruiz Declaration*

Defendant moved for a new trial under Penal Code section 1181, subdivision 8,[6] based on Ruiz's posttrial declaration. We conclude that there is no basis for interfering with the trial court's denial of this motion.

■ " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' " (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1318 [248 Cal.Rptr. 834, 756 P.2d 221]; see *People* v. *Farmer* (1989) 47 Cal.3d 888, 917 [254 Cal.Rptr. 508, 765 P.2d 940]; *People* v. *Dyer* (1988) 45 Cal.3d 26, 50, 52 [246 Cal.Rptr. 209, 753 P.2d 1]; *People* v. *Martinez* (1984) 36 Cal.3d 816, 821 [205 Cal.Rptr. 852, 685 P.2d 1203]; *People* v. *McDaniel* (1976) 16 Cal.3d 156, 179 [127 Cal.Rptr. 467, 545 P.2d 843]; *People* v. *Hill* (1969) 70 Cal.2d 678, 698 [76 Cal.Rptr. 225, 452 P.2d 329].) " '[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background.' " (*People* v. *Dyer, supra,* 45 Cal.3d at p. 52.)

■ In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: " '1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.' " (*People* v. *Sutton* (1887) 73 Cal. 243, 247-248 [15 P. 86]; see *People* v. *Farmer, supra,* 47 Cal.3d at p. 917; *People* v. *Dyer, supra,* 45 Cal.3d at p. 50; *People* v. *Martinez, supra,* 36 Cal.3d at p. 821; *People* v. *McDaniel, supra,* 16 Cal.3d at p. 178.)

■ Here, even assuming that Ruiz's posttrial declaration was newly discovered evidence and not cumulative to other evidence bearing on the factual issue of defendant's guilt, it is unlikely that the declaration would be such as to render a different result probable on retrial. (See *People* v. *Sutton, supra,* 73 Cal. at p. 247.) At trial, Ruiz provided little inculpatory evidence

---

[6]Penal Code section 1181, subdivision 8, provides in relevant part:

"When a verdict has been rendered . . . against the defendant, the court may, upon his application, grant a new trial, in the following cases only:

" . . . . . . . . . . . . . . . . . . . . .

"8. When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. . . ."

against defendant. Rather, she increasingly demonstrated a desire to implicate either herself or Ortiz. Hence, while we have previously held that "a motion for a new trial should be granted when the newly discovered evidence contradicts the strongest evidence introduced against the defendant," (*People* v. *Martinez, supra*, 36 Cal.3d at p. 823) Ruiz's ultimate and more detailed confession to the murder failed to significantly contradict or diminish any probative value of her earlier testimony regarding defendant's guilt. More importantly, it failed to diminish the strength of much more damaging testimony against defendant, such as Johnnie's identification of defendant as the assailant and Cano Yanez's account of sounds of violence at midnight.

In addition, "the trial court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable." (*People* v. *Beyea* (1974) 38 Cal.App.3d 176, 202 [113 Cal.Rptr. 254].) Ruiz's declaration was inconsistent not only with certain aspects of her prior statements and testimony, and with her demeanor on the night and morning of the attack on Amanda and her death as testified to by Ruiz, defendant, and other witnesses, but also with Victoria Diaz's declaration also filed in support of the motion for new trial. Ruiz's declaration also contradicted her son Johnnie's identification of defendant as the assailant, Cano Yanez's testimony regarding the time he heard the banging noises on the bedroom wall, and defendant's testimony that Ruiz often allowed Amanda to cry for extended periods of time without being bothered by it. In light of Ruiz's series of newly remembered revelations of critical exculpatory evidence, her obvious continued attachment to defendant, and conflicts between her stories and other evidence admitted at trial, the trial judge was well within his discretion in finding that the proffered new testimony lacked credibility, and implicitly finding that it would not have changed the result on retrial. (See *People* v. *Dyer, supra*, 45 Cal.3d at p. 51 ["defendant's own trial testimony contradicted the declarations which formed the basis of his new trial motion"]; *People* v. *Langlois* (1963) 220 Cal.App.2d 831, 834-835 [34 Cal.Rptr. 116] [recantation of important prosecution witness not deemed credible when by "her own statement, she was in love with defendant and desired to help him to avoid punishment"].) In sum, there was no basis on this record for the Court of Appeal to interfere with the trial court's denial of the motion for new trial based on Ruiz's posttrial declaration.[7]

---

[7]Given our disposition on the third factor, and the facts of this case, we need not reach the fourth and fifth factors, or whether the party could not with reasonable diligence have discovered and produced the evidence at trial, and whether " 'these facts [were] shown by the best evidence of which the case admits.' " (*People* v. *Sutton, supra*, 73 Cal. at pp. 247-248.)

## B. *Ex Parte Conversation*

■ Defendant also moved for a mistrial and a new trial on the ground that the trial court's ex parte conversation with the jury was prejudicial. ■ "It is well settled that the trial court should not entertain, let alone initiate, communications with individual jurors except in open court, with prior notification to counsel." (*People* v. *Wright* (1990) 52 Cal.3d 367, 402 [276 Cal.Rptr. 731, 802 P.2d 221].) " 'This rule is based on the precept that a defendant should be afforded an adequate opportunity to evaluate the propriety of a proposed judicial response in order to pose an objection or suggest a different reply more favorable to the defendant's case.' " (*Ibid.*) We have also observed, however, that " '[t]here is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The . . . conclusion that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice.' " (*Id.* at pp. 402-403.) "Although such communications violate a defendant's right to be present, and represented by counsel, at all critical stages of his trial, and thus constitute federal constitutional error, reversal is not required where the error can be demonstrated harmless beyond a reasonable doubt." (*Id.* at p. 403.)

We applied these rules to an ex parte conversation in *People* v. *Jennings*, *supra*, 53 Cal.3d 334. There, prior to excusing the jury for the day, and without counsel present, the trial judge discussed with the jury its schedule of deliberations. (*Id.* at pp. 382-383.) One juror indicated that he had a " 'personal question. If we come up to a[n] 11 to 1 decision on something, . . . is that a mistrial or something or other?' " (*Id.* at p. 382.) The court explained that " 'that would be considered a deadlocked jury' " on " 'that one particular count.' " (*Ibid.*) He then urged the jurors to " 'try to reach a verdict on a count if it's possible,' " and if they reached " 'a point where you are unable to do so and need further assistance, then bring that to our attention, whether that involves just one count or inability to reach a decision as to one or more counts, or whatever the situation is.' " (*Id.* at p. 383.)

We concluded that the ex parte communication was harmless beyond a reasonable doubt for two reasons. First, "nothing in the court's admonition to the jury was an incorrect statement of law." (*People* v. *Jennings*, *supra*, 53 Cal.3d at pp. 384-385.) "Significantly, defendant [did] not explain in what manner the court's admonition was erroneous." (*Id.* at p. 385.) "Thus, the

trial court's response to the juror's question did not implicate defendant's substantial rights." (*Ibid.*) "Second, the court promptly notified defense counsel of its action and encouraged counsel to review the court reporter's notes and suggest a further admonition, if desired." (*Ibid.*)

 In this case, the trial judge should have declined to answer the juror's question, immediately terminated all discussion, and reminded the jury that any questions of law on which they desired guidance must be in writing. In general, a court should then, as the trial judge did here, promptly notify counsel and make a record of the inquiry.

However, as in *Jennings, supra,* 53 Cal.3d 334, the error here was not prejudicial. First, defendant's claims to the contrary notwithstanding, he fails to point to, and we fail to discern, any misstatement of law in the judge's answer. More importantly, defendant did not object at trial to any misstatement or omission in the trial judge's answer, but rather cooperated in drafting a written answer to the subsequent written jury question.

Second, defendant was promptly notified of both the ex parte communication and the written question, agreed with the court and prosecution on the proper response to be given to the written inquiry, and requested no additional instructions. That concurrence waives any defects in the instruction. (Cf. *People* v. *Poon* (1981) 125 Cal.App.3d 55, 75 [178 Cal.Rptr. 375] [defendant waived any instructional error by failing to seek appropriate admonishment and expressing agreement with trial court's response].) In addition, defendant waited until the afternoon of the next court day to move for a mistrial, thus indicating that any perceived prejudice was not even immediately apparent to him. Moreover, defendant fails to assert what might have transpired had counsel been present. (See *People* v. *Pride* (1992) 3 Cal.4th 195, 263 [10 Cal.Rptr.2d 636, 833 P.2d 643].) We also note that the jury's written question was the *third* question to the court from the jury following the ex parte communication that morning. This weakens any characterization of the deliberations as fixated on speculation regarding defendant's prior conduct. Indeed, the jury verdict was not returned until the afternoon of June 29, two days after the ex parte conversation.

Defendant's argument is based on the assumption that the jury ignored repeated instructions not to speculate and to decide the case solely on the evidence presented. However, "[t]he crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People* v. *Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [286 Cal.Rptr. 801, 818 P.2d.) We conclude that any error by the trial judge in engaging in the ex parte communication with the

jurors was harmless beyond a reasonable doubt in light of the trial court's correct instructions on the matter, its prompt notification of counsel of the conversation, defendant's agreement to the court's response to the written question, and defendant's failure to request further instructions. (*People* v. *Jennings, supra,* 53 Cal.3d at pp. 384-385.)[8]

CONCLUSION

The trial court did not err either in denying defendant's motion for a new trial based on Elizabeth Ruiz's posttrial declaration or in denying defendant's motions for mistrial and new trial based on the court's ex parte communication with the jury. Accordingly, the judgment of the Court of Appeal is reversed, and the case is remanded to that court for further proceedings.

Lucas, C. J., Panelli, J., Kennard, J., Baxter, J., and George, J., concurred.

**MOSK, J.,** Dissenting.—Two people know who killed Amanda Ortiz. One of them, Elizabeth Ruiz, Amanda's mother, swore after defendant's trial that she killed the child; defendant has always sworn he did not do so. The jury heard only defendant's denial, and found him guilty of second degree murder. A new jury should consider the case now that Ruiz has confessed.

I.

I recognize that a trial court enjoys wide discretion to grant or deny a new trial motion (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1318 [248 Cal.Rptr. 834, 756 P.2d 221]), that a nonparty's posttrial confession is to be viewed with some suspicion (*People* v. *McGaughran* (1961) 197 Cal.App.2d 6, 17 [17 Cal.Rptr. 121]), and that in deciding whether a confession or recantation warrants a new trial on the ground of newly discovered evidence, the trial court should consider whether a jury could find the newly discovered statement credible (*People* v. *Minnick* (1989) 214 Cal.App.3d 1478, 1482 [263 Cal.Rptr. 316]). The trial court in this case declared Ruiz unworthy of belief—thereby signaling its view that a jury would also be unpersuaded—and further stated that it was convinced beyond a reasonable doubt that defendant killed Amanda.

Nevertheless, " 'in determining whether there has been a proper exercise of discretion on [a new trial] motion [on the ground of newly discovered

---

[8]Defendant relies on declarations by two jurors relating their memory of the details of the ex parte conversation with the trial judge. Neither account varies significantly from the trial court's. Moreover, Juror Maloof's declaration begins by stating "My memory of the specifics of the conversation is at this time unreliable." Juror Snow stated that she was "uncertain of the exact words spoken or [who] the speakers were."

evidence], each case must be judged from its own factual background.' " (*People* v. *Dyer* (1988) 45 Cal.3d 26, 52 [246 Cal.Rptr. 209, 753 P.2d 1].) The trial court commented that "possibly more than in most trials I have presided over, it was a search for the truth. And it was a search for the truth occasioned at least in large part by Elizabeth Ruiz and her many varying statements constantly during the trial."

In such circumstances, twelve minds may be better than one, no matter how learned in the law and steeped in trial experience that one mind might be. I therefore conclude that the trial court abused its discretion despite a conscientious review of the facts and the law.

To conclude that defendant murdered Amanda, the trier of fact had to find, in light of the instructions given, that defendant intended to and did unlawfully kill (Pen. Code, §§ 187, subd. (a), 188), or that, with conscious disregard for human life, he intended to and did commit an act the natural consequences of which were dangerous thereto. (*People* v. *Nieto Benitez* (1992) 4 Cal.4th 91, 112 [13 Cal.Rptr.2d 864, 840 P.2d 969] (conc. opn. of Mosk, J.).) Both mental states embody malice, the first express, the second implied. (Pen. Code, § 188.) At closing argument the prosecution stepped aside from any consideration of either first degree murder or express malice and instead urged a verdict of second degree murder on an implied malice theory. The jury then returned a verdict of guilt of second degree murder.

It is difficult to square that verdict with this record. The prosecution's theory—that defendant killed Amanda to ensure quiet in the apartment so he could have uninterrupted sex with Ruiz—strains against the facts. There was evidence that defendant was in tears while at the police station after he learned of the murder; he asked the police not to leave him alone while in custody, presumably so that he would not harm himself. At trial defendant gave a coherent and articulate account of the events of the night Amanda was killed. And the record contains many epistolary attestations to defendant's good character. Most striking, there was substantial evidence that Ruiz stayed passionately loyal to defendant, even though he was charged with her daughter's murder—one of her many visits to defense counsel's office took place on the day of the child's funeral.

To be sure: character references are no assurance that a person has not killed; a murderer can speak smoothly in his own defense; defendant's conduct at the police station could be explained by fear of punishment rather than anguish over Amanda's death; and Ruiz's visit to defendant's lawyer the day of her daughter's funeral may simply have been a macabre epilogue to the child's life story.

But the prosecution's case was less than overwhelming. The People offered the testimony of two percipient witnesses to the killing. Neither was helpful. The record raises significant questions whether the testimony of five-year-old Johnnie Ortiz was influenced by previous interviews, and the testimony he gave was, as far as I can discern from the record, not particularly useful in any event. The majority somewhat misunderstand the testimony of nine-year-old David Cano Yáñez, and Cano's account was less probative than the majority imply. Young Cano could only vaguely describe having perceived certain banging noises, the presence of a woman, and a man saying "shhh" at the time the prosecution theorized defendant killed Amanda. Part of the exchange that the majority state Cano overheard in fact occurred earlier that evening, not when defendant allegedly was alone with Amanda.

Small wonder that, after the evidently exhausted jurors returned their verdict following some three and one-half days of deliberations, the trial court observed, "It's obvious in looking at you that it's been stressful for you."

All these factors give rise to substantial doubt about defendant's role in Amanda's death. As the Court of Appeal observed, "it is inherently improbable that a mother would continue a romantic interest in the killer of her baby." After the trial Ruiz not only confessed to killing Amanda—a statement that, if believed, would subject her to liability for murder and other offenses—she also told a friend, Victoria Diaz, that she had killed the child. And against the prosecution's theory that defendant was impatient for sex, there was evidence suggesting that Ruiz's lust for defendant was equal to or greater than his for her. Considering the strong hints scattered throughout the record of Ruiz's overall neglect of her children, I would not be surprised if on retrial a jury might weigh whether it was Ruiz who beat Amanda, while defendant sat in the living room, so that she could have sex with him straightaway.

Notwithstanding the foregoing observations, I draw no ultimate conclusion about defendant's innocence or guilt. But given the difficult facts of this case, I would err on the side of caution and uphold the Court of Appeal's determination that a new trial is warranted.

## II.

A subject that has intrigued commentators for centuries is whether, with all of the safeguards of our Anglo-American system of jurisprudence, an innocent person can be convicted of homicide.

A recent study produces a revealing and disturbing answer. Professor Michael L. Radelet, Professor Hugo Adam Bedau, and Constance E. Putnam have published an account of 400 defendants who were erroneously charged with and convicted of homicide, and, were later proved to be innocent. Of that number, 26 were tried in California; and, of those, 6 were sentenced to death. (See Radelet et al., In Spite of Innocence (1992).)

What this study suggests is that we cannot uncritically accept a defendant's conviction of homicide and cavalierly disregard a subsequent confession to that offense by another person who was undeniably present on the occasion. How reliable the subsequent confession may be is debatable. But here it was not considered by a jury, the ultimate trier of fact. To preserve judicial integrity, I believe that the opportunity should not be denied.

This court unanimously held, in *In re Hall* (1981) 30 Cal.3d 408 [179 Cal.Rptr. 223, 637 P.2d 690], that the defendant had been improperly convicted of first degree murder. There it was a suggestive lineup that resulted in tainted identification. We said, "We need not decide, of course, whether the allegations of suggestiveness are true or whether, if true, they constitute a denial of due process. It is sufficient for the present purpose to observe that the defense was potentially meritorious, and that petitioner was denied an adjudication on the matter . . . ." (*Id.* at p. 434, italics omitted.) The key words, applicable to the instant case, are "potentially meritorious" and "denied an adjudication."

### III.

Even if I agreed with the result in this case, I could not subscribe to part of the majority's discussion.

Given their premise that the trial court's determination about Ruiz's credibility deserves complete deference, the majority are on safe ground when they strongly imply that, for reasons of credibility alone, the new trial motion was properly denied. If complete deference on the issue of credibility was warranted, then the trial court's view that Ruiz was unworthy of belief was the alpha and omega of the question whether a new trial should have been granted. (See *People* v. *McGaughran, supra*, 197 Cal.App.2d 6, 17.)

The remainder of the discussion, however, is misleading dictum.

The majority come perilously close to concluding that Ruiz's confession was cumulative. It was not. Unless a materially similar version of a confession or recantation is introduced at trial and rejected by the jury, such

evidence can never be cumulative, for it would always "contradict[] the strongest evidence introduced against the defendant" (*People* v. *Martinez* (1984) 36 Cal.3d 816, 823 [96 Cal.Rptr. 142]).[1]

In sum, cumulativeness does not qualify as a reason to deny the new trial motion. The majority's discussion is unnecessary to the decision they reach in this case. Reasonable minds can differ on whether the trial court's determination should be sustained on the stated ground that Ruiz's confession was unworthy of belief. If so, then that ground alone suffices. I am, of course, of a different view from that of the majority. I would affirm the judgment of the Court of Appeal. A jury—not the trial judge, not this court—should weigh the new facts.

---

[1]The majority do well to avoid charging defendant with lack of "diligence" in producing Ruiz's confession at trial. The law of causality prevents introducing evidence before it comes into being. I know of no power by which defendant could have obtained Ruiz's confession before she was prepared to give it; his authority does not extend to extracting information in shuttered rooms with bright lights and a rubber hose. (See *People* v. *Hairgrove* (1971) 18 Cal.App.3d 606, 610 [96 Cal.Rptr. 142].)