Filed 12/22/14  P. v. Pamphile CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. YAHVAH PAMPHILE, Defendant and Appellant. | B248604 (Los Angeles County Super. Ct. No. MA054680) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Bernie C. LaForteza, Judge.  Modified and affirmed with directions.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Yahvah Pamphile of murder.  (Pen. Code, § 187, subd. (a).)[1]  The jury found that defendant personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)). The jury further found that the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(4)).  Additionally, defendant waived his right to jury trial and admitted he had previously suffered a prior serious or violent felony, or "strike" (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

The trial court sentenced defendant to a total of 90 years to life in state prison, consisting of a base term of 25 years to life for murder, plus an additional 25 years to life as a result of the prior strike conviction, plus an additional 25 years to life on the firearm enhancement, and an additional 15 years to life as a gang enhancement.

Defendant contends that:  (1) the trial court abused its discretion in denying his motion for new trial; (2) the court incorrectly imposed a $40, rather than $30, court security fee; and (3) the gang enhancement was improper.  We agree with defendant's third contention only and accordingly modify the judgment.

## FACTS

**Prosecution Evidence**

Testimony of Curtis Witherspoon and Kelvin Rodell

On July 1, 2010, around 10:30 to 11:00 p.m., Curtis Witherspoon, Kelvin Rodell, and Rickey Elliott went to the Bamboo Club in Lancaster.  Witherspoon, Rodell, and Elliott were all members of the B.O.P. (Ballers on Point or Bloods on Point) gang.

At the club, Witherspoon, who went by the name of "Flirt," saw other gang members, including Kenny McNeal, of the Weirdo Bloods, and defendant, of the Hoovers.  Witherspoon had never seen defendant before but knew he was with the

---

[1]     Unless otherwise noted, all further statutory references are to the Penal Code.

2

Hoovers because defendant entered the club with other Hoovers members, including one called Jughead, with whom Witherspoon was familiar.

At some point, McNeal called Elliott a "bitch," and Elliott and McNeal made plans to fight. When the club let out around 1:45 a.m., a large crowd gathered in the parking lot to watch the fight. Elliott took his shirt off in preparation, handed Witherspoon a silver .357 revolver, and told him to put the gun in Elliott's car.

Rodell was standing in the parking lot, watching Elliott, ready to back him up in the fight. Aldwin Ezell came up to Rodell and asked him what was happening. Rodell knew Ezell as "Kojak" from the Rolling 60's gang; a few weeks before that night, Rodell, Elliott, and Ezell had a friendly conversation at a party. Rodell told Ezell that Elliott was going to fight McNeal, and Ezell responded, "[O]n neighborhood, I got your back."

As Ezell stood directly next to Rodell, Rodell heard footsteps from behind, looked back, and saw defendant walking toward Ezell. Defendant stopped about three to four feet from Ezell and shot Ezell. Rodell felt the impact of the gun blast and ran away. He saw defendant run to an orange Ford Crown Victoria, a car he had previously seen defendant driving.

Just prior to the shooting, Witherspoon was relieving himself next to Elliott's car. He turned around in time to see defendant, holding a black semiautomatic pistol, creeping up behind Ezell. Defendant got within a foot or two of Ezell, raised the gun, and shot him in the back of the head. After defendant shot, Witherspoon got scared and shot Elliott's gun in the air. Everybody ran away from the scene.

Witherspoon got into Elliott's car with Elliott and Rodell. They drove to Witherspoon's house and talked about what happened. Witherspoon told them he fired the gun because he was scared. Witherspoon left the gun in Elliott's car upon being dropped off at home.

Testimony of Ashley Cooper

Ashley Cooper was in a relationship with Ezell, and they had a child together. She went to the Bamboo Club with Ezell the night of the shooting. Cooper knew both Witherspoon and Elliott from high school. Ezell and Elliott had an acrimonious

3

relationship about five years before, but were on good terms by 2010. Outside the club that night, she saw Elliott and Ezell shake hands in a friendly matter, and Ezell shook hands with Rodell as well. Ezell and defendant, however, exchanged words inside the club, and appeared upset from their facial expressions.

When Cooper and Ezell left the club, Ezell walked her over to their car, and then he went to see why a crowd had gathered in the parking lot. As Cooper was taking her shoes off inside the car, she heard a gunshot. She drove toward the shot and saw Ezell on the ground. As she was driving, she saw Witherspoon running with a handgun, looking back. She did not see him fire the gun, and did know who shot Ezell.

Testimony of Detective Brandt House

Detective Brandt House was a lead investigating officer of the homicide. From the area of the shooting, he recovered a single expended cartridge case for a .380-caliber semiautomatic pistol; the cartridge case appeared to be freshly ejected. An autopsy later recovered a single, spent bullet from Ezell's skull. Ezell was shot with a .380-caliber weapon.

When he first began his investigation, Detective House believed that Witherspoon shot Ezell. The only person initially identified by witnesses as having a gun at the crime scene was Witherspoon. One witness said Witherspoon shot in the direction of Ezell, one witness said a light-skinned African-American male stood over Ezell, pointing a silver gun at him, and multiple witnesses said they heard Witherspoon saying, "I shot him." However, as Detective House continued to investigate, anonymous informants continued to mention defendant. When Detective House looked for defendant, he could not be found in California. Defendant was eventually located in Mississippi by the state parole fugitive apprehension team, and he was arrested and transported to California. After continuing his investigation, Detective House came to believe that Witherspoon did not shoot Ezell, and believed instead that defendant committed the crime.

In exchange for his testimony in this matter, Witherspoon pled guilty to negligent discharge of a firearm for shooting Elliott's gun in the air. Detective House also interviewed Rodell, who initially denied knowledge of relevant facts. As he was

4

interviewed over the course of a few hours, however, Rodell eventually identified defendant as the shooter. Rodell was not promised anything for his testimony, nor was he threatened.

Gang Evidence

Detective Robert Gillis testified as a gang expert for the prosecution. He stated that in 2010, there were well over 1,000 documented Hoovers gang members spread throughout the Los Angeles area. The Hoovers aligned themselves with the color orange and with the Houston Astros baseball team, and utilized the team's insignia, with an "H" and a five-point star. The gang's primary activities included murder and other shootings.

Defendant was a self-admitted Hoovers gang member. He had numerous tattoos reflecting his gang affiliation. One tattoo was of an "H" with a five-point star. Other tattoos were composed of blocks containing names of rival gangs, with the letter "K" appended. The letter "K" meant "killer" and was a sign of disrespect to the gangs listed.

As of 2010, the Hoovers were in an ongoing gang war with the Rolling 60's Crips gang, and had an "on sight" policy, meaning: "If they see a member of the rival gang, they are to do whatever it takes to get them on sight, no questions asked." The Rolling 60's gang had existed for decades and had thousands of members, including approximately 100 in the Antelope Valley. Of the gangs involved in the events on the night of July 1, 2010 (the Hoovers, the Rolling 60's, the Weirdo Bloods, and B.O.P.), only two had a rivalry—the Hoovers and the Rolling 60's. Detective Gillis opined that defendant's shooting of Ezell was committed for the benefit of the Hoovers gang.

**Defense Evidence**

Defendant testified on his own behalf. He was 29 years old at the time of trial in August 2012 and had previously been convicted of residential burglary. He stated that he used to be a Hoovers gang member but left the gang before being released from prison in 2008. The "K" after the rival gang names in his tattoos meant "killer" and was an expression of disrespect, but it did not mean that defendant had killed any gang members or wanted them dead.

Defendant went by himself to the Bamboo Club on the night of July 1, 2010. At the club, he danced and talked to a lot of women. He also met up with Jughead from the Hoovers.

Defendant knew who Rodell and McNeal were, but did not see either of them that night. He did not know Witherspoon, Elliott, or Cooper. He also did not know Ezell, and did not see him or talk to him.

Defendant was in the parking lot when he heard shots. He was not near Ezell and did not have a gun. Defendant ran to his car. He drove to his girlfriend Monica's house, which was near the club. Defendant denied that he shot or murdered Ezell.

Defendant drove an orange Ford. He had the car until July 4 or 5, 2010, when he paid $20 to park it at the Hollywood Casino in Inglewood. Defendant's other girlfriend, Sylvia from Rialto, picked him up in Inglewood and took him to her house in Rialto, where he stayed for a couple days. Meanwhile, Monica was supposed to pick the car up from Inglewood and drive it back to Lancaster. Defendant testified, however, that he eventually learned the car was stolen.

From Rialto, defendant took the train to Los Angeles, and the bus from Los Angeles to Mississippi. He went to Mississippi to visit his mother's grave. He did not go because he had committed murder and was trying to get away from the police. Defendant had numerous family members in Mississippi, and the family met there every year around his mother's birthday on July 7, in remembrance of her. Defendant's previous parole officer had given him permission to travel to Mississippi to pay his respects. His parole officer in 2010, though, denied permission. Defendant nonetheless decided to go, thinking he could return to California before he had to check in with his parole officer. Defendant was in Mississippi for only a couple days when he received a call from his aunt in Lancaster, who told him his parole officer discovered he was not home and that he had violated parole. Since he was already in violation, defendant decided that he would stay in Mississippi to celebrate his birthday. After spending about 20 days in Mississippi, defendant was arrested and returned to California.

## DISCUSSION

### I. Motion for New Trial

#### A. The Motion and Hearings

After the jury returned its verdict, defendant filed a motion for new trial arguing insufficiency of the evidence and discovery of new, material evidence. On appeal, defendant contends that the trial court abused its discretion by denying the motion because he would have received a more favorable result at trial if given the opportunity to present newly discovered evidence.

Defendant's motion for new trial stated that he learned the real name of his fellow Hoovers gang member Jughead when seeing him in county jail following trial. After discovering Jughead's name, the defense was able to interview him. In support of the motion for new trial, defendant submitted an investigation report prepared by a defense investigator. According to the report, the investigator interviewed Jughead—real name, Rena Naulls—in state prison in December 2012. Naulls said defendant was a "homeboy" of his, and they belonged to the same gang, a Hoovers gang called Ballers on Point, also known as B.O.P. Naulls believed he knew Witherspoon by the name of "Flirt," and he saw him at the club on the night of July 1, 2010. Flirt was a member of Bloods on Point, "the other side" of Ballers on Point. Naulls did not "get along" with Flirt "because of something that happened on the streets." As Naulls left the club, he talked with defendant in the parking lot. Defendant was very drunk and did not have a gun. Naulls then heard a gunshot and whipped his head around to see Flirt pointing a gun at the back of Ezell's head. Flirt, who was holding a semiautomatic handgun, stepped back and fired a second shot at Ezell. Defendant did not shoot anyone. According to the investigation report, Naulls was willing to testify to this information.

The initial hearing on the motion for new trial was continued because the trial court ordered that Naulls be removed from state prison to testify at the hearing. Naulls was a "miss-out" at the continued hearing and did not appear. At the continued hearing, defendant's counsel informed the court that she had recently received an audio recording of an interview of Naulls by a Detective Welle. The prosecutor confirmed that the

7

recording had just been turned over. According to the prosecutor, Detective Welle had forgotten to provide the recording to the district attorney's office, and the prosecutor did not learn of the recording until after trial. The prosecutor thought the statements made by Naulls in reference to defendant were more inculpatory than exculpatory, but the prosecutor nonetheless provided the recording to the defense. The court granted a continuance to allow the defense time to investigate, and it ordered Naulls to be produced at the next hearing.

At the next hearing, counsel for Naulls informed the trial court that Naulls refused to come to court. The court again continued the hearing to allow Naulls's counsel time to talk to him in jail.

The motion for new trial was finally heard on April 12, 2013. Defendant's counsel did not call Naulls to testify and Naulls did not appear. The trial court stated that it had wanted Naulls to testify and be subject to cross-examination so that it would not have to rely solely on the report submitted by the defense investigator. Defendant's counsel argued that the motion should be granted anyway because of the information provided to the investigator by Naulls. In addition, as another basis for granting the motion, defendant's counsel stated that Detective Gillis's gang testimony in this case was contrary to testimony he recently gave in another matter, where he stated that that gang members in the Antelope Valley tended to get along, and members of different gangs cooperated with each other, including, in at least one instance, Hoovers and Rolling 60's gang members. The court denied the motion for new trial.

### B. Analysis

A criminal defendant may move for new trial on specified grounds, including newly discovered evidence. (§ 1181, subd. 8.) The trial court's order denying the motion for new trial is reviewed for an abuse of discretion. (*People v. Lewis* (2001) 26 Cal.4th 334, 364.) "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: "'1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the

8

party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.""'" (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

At the hearing on the motion, the trial court stated how live testimony by Naulls would have allowed for cross-examination, and how the failure of Naulls to testify influenced the court's decision to deny the motion. The court expressly noted that it had authority to consider the credibility of the new evidence in deciding whether its introduction at trial would make a different result reasonably probable, citing *People v. Delgado*, *supra*, 5 Cal.4th 312, 329.

We find that the trial court did not err in determining the new evidence was unlikely to produce a different result. In deciding the motion, the court had before it only a report prepared by a defense investigator containing hearsay statements allegedly made by Naulls. Naulls was repeatedly given the opportunity to testify at the hearing, but, despite multiple continuances, he failed to do so. In addition, the audio recording of Naulls's interview with Detective Welle was described by the prosecutor as more inculpatory then exculpatory, a characterization defendant's counsel did not dispute. Given the unpersuasive nature of this evidence, denial of the motion was proper.

Defense counsel's statement at the hearing that Detective Gillis gave inconsistent gang testimony in another case does not change our analysis. First, it is not clear that Detective Gillis's later testimony actually was inconsistent. Key points of his testimony in this matter included the "on sight" policy that existed between the Hoovers and the Rolling 60's in 2010, and that a Hoovers gang member would shoot a Rolling 60's member to benefit the gang. The record does not show that Detective Gillis contradicted either of these points in the later testimony. Second, even if Detective Gillis's trial testimony were discounted, the evidence at trial supported the theory that defendant had a motive to shoot Ezell. Both Rodell and Witherspoon testified that the Hoovers and the Rolling 60's had a decades-long rivalry, and Rodell testified that the conflict was "on sight." Moreover, Cooper testified that Ezell and defendant exchanged words and appeared upset with each other the night of the incident. Third, a motion for new trial

9

generally will not be granted based on newly discovered evidence that may merely impeach a witness. (*People v. Moten* (1962) 207 Cal.App.2d 692, 698; *People v. Green* (1982) 130 Cal.App.3d 1, 11.) We see no reason to depart from that general rule here.

## II. <u>Imposition of Court Security Fee</u>

Defendant next argues that a $40 court security fee he was ordered to pay was excessive. At the time of conviction in this matter, the court security fee specified by section 1465.8, subdivision (a)(1) was $40. At the time the crime was committed, an earlier version of section 1465.8, subdivision (a)(1) set the fee at $30. Defendant contends that by imposing a $40 fee, the trial court improperly gave retroactive effect to the fee increase.

By its terms, the court security fee "shall be imposed on every conviction for a criminal offense . . . ." (§ 1465.8, subd. (a)(1).) The proper fee is determined by the amount set by statute at the time of conviction, not at the time of commission of the crime. (*People v. Alford* (2007) 42 Cal.4th 749, 754; *People v. Castillo* (2010) 182 Cal.App.4th 1410, 1414-1415; *People v. Mendez* (2010) 188 Cal.App.4th 47, 60-61.) The trial court, therefore, did not err by imposing a court security fee of $40.

## III. <u>Improper Gang Enhancement</u>

Finally, defendant contends that the trial court improperly imposed a 15-years-to-life gang enhancement pursuant to section 186.22, subdivision (b)(4). Only certain enumerated offenses are covered by section 186.22, subdivision (b)(4), and murder is not one of them. Here, the violent felony—murder—is punishable by life in prison, and therefore section 186.22, subdivision (b)(5) applies. (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004.) Section 186.22, subdivision (b)(5) provides for a 15-year minimum parole eligibility requirement, not an enhancement. (*Lopez*, at p. 1004.)

The Attorney General concedes this point and acknowledges that the 15-year minimum parole eligibility requirement is superfluous in this case, as defendant is already subject to a minimum parole eligibility requirement.

10

## DISPOSITION

The judgment is modified by striking the 15-year enhancement term imposed pursuant to section 186.22, subdivision (b)(4), reflecting a total term of 75 years to life in state prison.  The trial court shall send a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.