Filed 6/16/15  P. v. Pilola CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. GEORGE A. PILOLA, Defendant and Appellant. | B158266 (Los Angeles County Super. Ct. No. VA066706) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John A. Torribio, Judge.  Affirmed.

Charles R. Khoury, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Appellant and defendant George A. Pilola appeals from a judgment of conviction for sexual penetration by a foreign object and aggravated mayhem. He contends that the trial court erred in denying his motion for a new trial based on a post-trial declaration from the victim recanting her trial testimony that identified appellant as her attacker.

The victim (who had been married to appellant for 14 years but who was separated from him at the time she was assaulted) was the sole witness to identify appellant as her attacker (among other things, the attacker broke into her house, tried to anally rape her with a bottle, and carved gang initials on her back). At trial, she was certain appellant was the attacker: although the attacker's face was covered, she recognized him because of his voice, the way he moved, his breathing, and the manner in which he soothed their baby back to sleep when he woke up during the commission of the attack. She also saw appellant's face when he was in the bathroom washing.

In a declaration in support of a motion for new trial, the victim recanted her trial testimony identifying appellant as her attacker, and said she had falsely identified him because she was angry that he had publicly introduced his girlfriend as his fiancée. The trial court found her recantation not credible, and denied the motion for new trial. We find no abuse of discretion in the trial court's ruling, and affirm the judgment.

# PROCEDURAL AND FACTUAL BACKGROUND

*Information*

Appellant was charged by an information with three felony counts:
(1) sexual penetration by foreign object (Pen. Code, § 289, subd. (a)(1));[1]
(2) aggravated mayhem (§ 205); and (3) first-degree residential burglary (§ 459).
The information also alleged that because appellant used a knife and binding, and committed the offense during the commission of a residential burglary, he was subject to alternate sentencing under the One Strike law (§ 667.61, subds. (a), (b), (d), (e)). The information further alleged sentence enhancements were applicable due to appellant's use of a knife during the commission of the mayhem and the burglary (§§ 1192.7, subd. (c)(23), 12022, subd. (b)(1), 12022.3, subd. (b)).

Appellant pled not guilty to all charges and a jury trial was held.

*Evidence at Trial*

The victim and appellant were married for 14 years, but were separated at the time of the incident. They had five children together, from 16-year-old Armando to 18-month-old Favian. At the time the crimes occurred, the four younger children lived with their mother, but Armando was living with appellant. Appellant's girlfriend, Laura Rodriguez, also lived with appellant.

A. *The Victim's Testimony*

On the night in question, the victim went to bed at approximately 9:30 p.m. Her baby Favian was sleeping next to her in bed. She locked the bedroom door before getting into bed. Later that night, she woke up when someone kicked the

---

[1]     All further statutory references are to the Penal Code.

3

bedroom door down.  Although the intruder's face was covered by a beanie, she immediately knew it was her husband, because he had kicked the door down many times before.  He grabbed her by her hair and began beating her head with a hard object, and kicked her in the side.

He started taking things out of the closet and making a mess.  He said, "Okay, bitch.  Do you have any money?  Do you have any jewelry?"  He grabbed the rings off her fingers.  He also grabbed her necklace and bracelet.[2]

He tied up her wrists behind her back, taped her mouth, and then bound her legs.  He took an unopened beer bottle and inserted it in her rectum, which was very painful and caused her to scream, at which point he took it out.  He grabbed her by the hair and dragged her down the hallway to the living room.  When they were in the living room, they saw red lights from a police car that pulled up outside.  The assailant whispered to her that if she made a noise, he would kill her.

He dragged her back to the hallway and forced her to lie face down on the floor.  The assailant ran from room to room, peeking out the windows and whispering to himself.  He was shaking and sweating profusely.  He seemed nervous, scared, and angry.

While she was lying bound, face down on the floor, Favian woke up.  He came out of the bedroom crying and calling for his mother.  She could not answer because her mouth was taped.  The assailant picked up the baby and comforted him, saying "Okay, yeah, baby, yeah," to Favian, in the same way the victim had heard her husband speak to Favian many times in the past.  The assailant took Favian back to bed and closed the door, and Favian went back to sleep.  Favian reacted to the assailant as he typically reacted to his father.

---

[2] The bracelet and necklace were later found on top of the counter in the kitchen.

While she was lying in the hallway, the assailant started to reinsert the bottle again, this time without the cap, but she was crying and begging him to stop. Then he told her, "You didn't let yourself put the bottle inside so I'm going to do this to you." Using a small knife, he carved some letters on her back and her breast that caused permanent scarring. While carving the letters, he was whispering to her, asking her "Where's your husband?" "What's your husband's name?" "Where are your kids?"

The assailant, who was still very sweaty, went to the bathroom to wash his face. He turned on the light in the bathroom. From where she was lying in the hallway she could see into the bathroom. When he opened the mirrored door above the sink and grabbed a towel to dry off his face, she saw appellant's face in the mirror.

Approximately 15 minutes after the police lights stopped flashing outside, appellant left. He took her purse, which contained her phone, a pager, some money, a wallet, checkbook and credit cards. She heard a car start, and thought it sounded like a van similar to hers.

After waiting a few minutes to make sure appellant was gone, she untied herself. Approximately 10 minutes after he left her home, she ran to the neighbor's house and used the phone to call her oldest son, Armando, at appellant's apartment. She called to tell him to get the kids out of appellant's house, because she was worried that appellant was going to hurt them next. She told Armando that appellant had attacked her and to get out of the house. Then she called 911.[3]

---

[3]     It was stipulated that the victim called 911 at 2:34 a.m.

At the hospital, she learned that the blows had broken her jaw. She did not allow the doctor to perform a rectal examination because he said it was going to hurt a lot.

Asked by defense counsel whether she had any doubts that the assailant was her husband, she responded that she had no doubts. Even before she saw his face in the mirror, she knew it was him because of "his hands, the way he was moving, his breath," and "the way he was saying stuff to me."

B. *Armando's Testimony*

Armando testified that on the night the crime occurred, he, his brother, George Jr. and his two sisters were at appellant's two-bedroom apartment. At around 10:45 pm, all the children went to sleep in the living room on a blow-up mattress.

At approximately 2:28 a.m., Armando heard the cordless phone ring. He took the phone into his bedroom and answered it. His mother was on the line, crying, telling him that appellant was at her house and had tried to kill her. She told him to take his siblings and leave the apartment. Armando hung up the phone and went into the other bedroom, where Rodriguez was asleep, to tell her what had happened. Appellant, who normally slept in the bed with Rodriguez, was not there. Armando did not see appellant in the apartment but he did not look for him.

Armando then took the keys to the family's Ford Arrowstar van and quickly left the apartment to go to his mother's home. The van was parked right next to the family's other car, a Thunderbird. He sped off in the car, squealing the tires as he pulled out of the parking spot, and about six minutes into the drive, turned on his cellphone to call 911, a call that 911 records show was made at 2:34 a.m. After a four-minute call, he then turned his phone off. He turned it on again to make

6

another call, and saw a missed call from appellant's apartment. He received another call from appellant, who asked him where he was, and Armando told him, "I came to look for you. My mom said you were at the house." Appellant replied, "No, I've been at the apartment." He told Armando that he had chased him out of the apartment and that he had heard the tires spin out. He told Armando, "I don't know what's happening but just come back." On direct examination, Armando testified with the aid of cell phone records that he received this phone call at 2:39 a.m. On cross-examination, Armando testified that the first time he spoke with appellant was at 2:46 a.m.

At 3:03 a.m., when Armando had already arrived at his mother's home, appellant called his cell phone again, and talked to an officer at the scene on that line.

### C. *Rodriguez's Testimony*

The night of the crime, Rodriguez went to bed by 10:00 p.m. At the time she went to sleep, appellant was in the living room with his four children. He never came to bed with her.

She heard the phone ring in the middle of the night, and noticed that the clock said it was 2:30 a.m. A minute or so later, Armando came into the room and said, "My mom called and said my dad [is] hurting her." Shortly thereafter she heard the front door closing. A minute and a half to two minutes later, she heard the front door closing again. She came out to the living room and saw appellant. He asked her, "Where did Armando go?" She told him what Armando had told her. Appellant told her he had been home at the apartment, and he did not understand why Armando had left. He tried to call Armando's cell phone. Appellant also tried to call the victim's house, and he tried Armando again and

7

reached him. He told Armando to stop the car and not to keep going to his mother's house, and tried to convince Armando that he was calling from his apartment. Appellant spoke to Armando twice, with the police coming on the line the second time.

Rodriguez further testified that the keys to the Thunderbird, the family's other car, were in her purse, next to her bed, on the night of the crime. She also testified that there was only one set of keys to the van.

D. *George Jr.'s Testimony*

11-year-old George Jr. testified that the night his mother was attacked, he was sleeping in appellant's living room, and he thought his father was sleeping in his bedroom. He did not remember his father lying down with him and his siblings in the living room. He heard the phone ring in the night and heard Armando answer it. He overheard a comment that his mother had been hurt, and saw his brother take the car keys and leave. He tried to call out that he wanted to go with his brother but he did not think his brother heard him. After Armando left, George Jr. went to the bathroom and stayed there for around three minutes. He heard the front door open and when he came out of the bathroom, he saw appellant standing next to the front door, looking out the door. He was asking where Armando went. When asked if appellant told him he had just come back from working out, George Jr. said he did not say that. However, when asked if he might have told the investigating detective that, George Jr. responded, "Probably." George Jr. estimated that approximately 13 minutes passed from the time the phone woke him up to the time he saw appellant in the living room.

E. *Deputy Jeffrey Flotree's Testimony*

Deputy Flotree testified that at 1:28 a.m. on the night of the attack, he responded to a report that a neighbor had heard screams and moans coming from the residence next door. He parked on the street, leaving his vehicle's amber lights on. He woke up the residents who lived to the east of the neighbor who had reported the disturbance, and knocked on the victim's door several times, but there was no response. Unable to locate the source of the disturbance, he went back to his car, turned off the flashing lights and drove around the area for approximately 15 minutes before leaving at approximately 2:14 a.m.

He responded to the scene again after the victim called 911. He found her standing on the parkway adjacent to the street, with clear masking tape that had been torn and stretched around her neck and around her wrists and ankles. She was hysterical. He talked to her briefly at the scene and she told him she had been attacked by her ex-husband George. Because she appeared to need immediate medical attention, she was transported to the hospital and he interviewed her later at the hospital. He stated that it was difficult to communicate with her at the hospital because she was very traumatized.

The victim told him that initially she was not able to see her attacker's face in the bedroom and that he was wearing a cap pulled down low. She told him that she knew it was her ex-husband because of his voice, his physical dimensions, and because of an incident when the baby woke up. Later, when the assailant went into the bathroom, she saw him pull off the ski mask and splash water around his face.

Deputy Flotree authenticated photographs of the victim's injuries from that night. He testified that the letters VNWK, which signified the Barrio Norwalk gang, had been carved on the victim's back and breast. Deputy Flotree concluded

9

that the attacker wanted to create the appearance that members of the Barrio Norwalk gang had committed the crime.

The deputy also testified that he found the beer bottle and roll of tape used in the attack. He recovered and admitted into evidence a steak knife that was lying in the entrance way, as well as another steak knife. However, besides the unusual locations in which the knives were found, there was no indication that either was the knife used to cut the victim. The victim did not tell the deputy that any property had been taken.

### F. *Deputy Wayne Inskeep's Testimony*

Deputy Inskeep, the investigating officer, testified that no fingerprints were recovered, which was not unexpected since the victim stated the attacker was wearing gloves. No blood was found on the two knives recovered at the scene. As part of his investigation, he saw that the mirror in the bathroom was moveable.

Deputy Inskeep described his interview with George Jr. about the night the victim was attacked. George Jr. told him that when he walked out of the bathroom after being awakened in the middle of the night, he saw his father walking into the apartment. George Jr. stated that appellant seemed sweaty, like he had been exercising. According to George Jr., appellant said he had been "working out."

### G. *Appellant's Testimony*

Appellant testified that he went to sleep with his boys on the air mattress the night of the crime, after watching television until approximately 11:30 p.m. He denied that he ever left the apartment that night.

In the middle of the night, he was awakened by the sound of a door slamming. Appellant got up, put his shoes on and walked out the door. Then he

10

heard his van start and heard the wheels spin and the van pull out of the driveway. He ran down the stairs and up the street about 200 or 250 feet until he saw the van disappear around a corner. He ran back up to the apartment. On direct examination, he testified that he went directly into the master bedroom to ask Rodriguez what had happened. She told him Armando had gone looking for him because he had received a call from his mother that appellant was at her house trying to kill her.

On cross-examination and then on redirect, appellant stated that when he came back from chasing the van he was planning to call 911 because he believed the van had been stolen. The phone was not in the kitchen so he went into the master bedroom to get the phone there, and he found Rodriguez awake. At that point she asked where he had been and what was going on, and she told him Armando had gone looking for him. He told her he had been downstairs trying to find out who took the van.

Appellant then called Armando's cell phone, but there was no answer. He called again, and Armando answered, and appellant asked where he was going and told him to come back. Armando said he would come back. Appellant waited a little longer and then tried calling his wife at her house. Then he called Armando again and spoke to him again. Armando said he was right around the corner from his mother's house. Appellant spoke to Armando a final time after Armando arrived at his mother's house, and he spoke to a deputy as well. While he was talking to Armando, he saw his son, George Jr., standing in the hallway looking at him. He told George Jr. that everything was okay and he should go back to sleep, which the boy did.

11

Appellant testified that driving at a normal speed, it took 20 or 25 minutes to drive from his apartment to his wife's house, and the fastest possible trip would take 15 to 20 minutes.

*Verdict*

The jury found appellant guilty of sexual penetration by a foreign object as well as aggravated mayhem, but not guilty of residential burglary. The jury also found true the allegations with respect to use of binding and use of a deadly weapon in the commission of the offense of sexual penetration with a foreign object (§ 667.61, subd. (e)).

*Motion for New Trial*

Appellant filed a motion for a new trial, one of the grounds being the discovery of new evidence. In a declaration in support of appellant's motion for a new trial, the victim recanted, claiming that she lied when she identified appellant as her attacker. She stated she was angry with him because at his sister's wedding he had introduced his girlfriend as his fiancée, and the victim believed their separation was only temporary. She stated that she felt appellant betrayed her and needed to be punished. At the time she named appellant as her attacker, she believed that her husband would spend some time in jail but she did not realize that what she was doing was "so serious."

The trial court denied the motion for a new trial. In denying the motion, the trial court found the recantation not credible. Acknowledging the defense theory that an unidentified gang member committed the crime, the court stated: "What's the explanation for this gang member randomly breaking into this woman's house and terrorizing her . . . and then leaving and not taking the TV, or the radio, or

12

anything, just taking her purse, her personal property. . . . [W]ith all due respect, I have been a defense attorney, I have been a commissioner, and I've been a trial judge, and I've never seen this bizarre a crime in all those years by a random criminal." When appellant stated that he did not understand why the motion for a new trial was denied, the court replied, "I ruled that the evidence was more than satisfactory, more than believable to convict you of this crime, and I don't accept your wife's recantation. I don't find it credible."

*Sentencing and Appeal*

The trial court imposed a sentence of 25 years to life on the offense of sexual penetration with a foreign object, based on the application of the One Strike law (§ 667.61). As to the offense of aggravated mayhem, the court sentenced him to life in prison with a possibility of parole, which sentence was to run consecutively to the sentence on the other count.

Appellant timely appealed, but his first appeal was dismissed in 2002 pursuant to appellant's request and the remittitur was issued. However, on April 4, 2014, appellant moved to recall the remittitur, on the ground that he had received ineffective assistance from his previous retained counsel, who had urged appellant to abandon his appeal based on the mistaken belief that abandonment was necessary to have DNA testing conducted in his case. We granted the motion to recall the remittitur and reinstated appellant's appeal.

**DISCUSSION**

An appellant may move for a new trial based on newly discovered evidence. (§ 1181, subd. (8); *People v. McCurdy* (2014) 59 Cal.4th 1063, 1108.) "'"'We review a trial court's ruling on a motion for a new trial under a deferential abuse-

of-discretion standard.' [Citations.] "'A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.''" [Citation.]' [Citation.]" (*People v. McCurdy, supra,* 59 Cal.4th at p. 1108.)

"It has long been recognized that 'the offer of a witness, after trial, to retract his sworn testimony is to be viewed with suspicion.' (*In re Weber* (1974) 11 Cal.3d 703, 722; see also *People v. Minnick* (1989) 214 Cal.App.3d 1478, 1481 (*Minnick*); *People v. McGaughran* (1961) 197 Cal.App.2d 6, 17 ['It has been repeatedly held that where a witness who has testified at a trial makes an affidavit that such testimony is false, little credence ordinarily can be placed in the affidavit . . . .'].)" (*In re Roberts* (2003) 29 Cal.4th 726, 742; see *People v. Redmond* (1966) 246 Cal.App.2d 852, 864-865.) "The role of the trial court in deciding a motion for new trial based upon a witness's recantation is to determine whether the new evidence is credible, i.e., worthy of belief by the jury. That determination is made after a consideration of all the facts pertinent to the particular issue." (*Minnick, supra,* 214 Cal.App.3d at p. 1482.)

Here, the trial court did not abuse its discretion in finding the victim's recantation not credible, that is, not worthy of belief by the jury. Her testimony at trial as to why she recognized appellant was compelling: she recognized his voice, the way he moved, and his breathing. She heard him speak words to their baby that he had spoken in the past to calm the baby, and saw that he was able to soothe the baby back to sleep. She also saw his face when he was in the bathroom cleaning up. Her post-trial claim that she falsely implicated him in this horrific attack because she was jealous that he called his girlfriend his fiancée at his sister's wedding pales in credibility to her factually specific testimony at trial explaining her certainty that he was her attacker. Further, as the trial court noted, it was

14

highly unlikely that this attack, obviously intended to injure and personally humiliate her, was committed by a random stranger. In short, the trial court did not abuse its discretion in finding the recantation not credible.

To the extent appellant contends that the trial court erred by not expressly discussing the five factors listed in *People v. Delgado* (1993) 5 Cal.4th 312, 328, for evaluating newly discovered evidence,[4] the contention begs the question. Only if the trial court determines that the recantation is credible must it consider the other requirements for granting a new trial on the grounds of newly discovered evidence. (See *Minnick, supra,* 214 Cal.App.3d at p. 1482 ["Once the trial court has found the recantation to be believable, it must then decide whether consideration of the recantation would render a different result on retrial reasonably probable"].) Given that the court found that the recantation was not credible (that is, not worthy of belief by a reasonable jury), the court necessarily concluded that the recantation would not render a different result probable on retrial. That determination was sufficient to deny the new trial motion.

We reject appellant's argument, made for the first time in his reply brief, that the trial court erred in failing to take testimony from the victim regarding her recantation. Relying on non-California authorities, appellant contends the trial court should have conducted a hearing with live testimony to evaluate the credibility of the recanting victim. California Supreme Court precedent rejects this argument.

---

[4]    "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors:  "'1.  That the evidence, and not merely its materiality, be newly discovered; 2.  That the evidence be not cumulative merely; 3.  That it be such as to render a different result probable on a retrial of the cause; 4.  That the party could not with reasonable diligence have discovered and produced it at the trial; and 5.  That these facts be shown by the best evidence of which the case admits.'"" (*Delgado, supra,* 5 Cal.4th at p. 328.)

In *People v. Howard* (2010) 51 Cal.4th 15 (*Howard*), the defendant moved for a new trial based on new exculpatory evidence in the form of declarations from witnesses, but the trial court found the declarations unworthy of belief and denied the motion. The appellant argued on appeal that the trial court erred by failing to obtain live testimony from the declarants before determining that their declarations were not credible. The Supreme Court found no error, where at the hearing on the motion for a new trial, "defense counsel made no attempt to produce those witnesses, and submitted his motion on the declarations alone." (*Id*. at p. 44; see also *People. v. Langlois* (1963) 220 Cal.App.2d 831, 835 [rejecting contention that trial court should have called witness to testify regarding post-trial recantation where defendant made no request that witness be called to the stand].) The court distinguished the case before it from *People v. Hairgrove* (1971) 18 Cal.App.3d 606, 609-611, in which "the affiant was present in court at the hearing on the new trial motion, and the court not only refused to hear from him but advised him against testifying." (*Howard, supra,* 51 Cal.4th at p. 44.)

As in *Howard*, defense counsel in this case explicitly submitted his motion for a new trial on the pleadings. There is no indication from the record that the victim was present at the hearing on the motion for a new trial, and defense counsel did not offer to have her testify. Accordingly, we reject appellant's contention that the trial court should have heard testimony from the victim before determining that her recantation was unworthy of belief.

In sum, the trial court did not abuse its discretion in denying the motion for new trial based on newly discovered evidence.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P.J.


We concur:



MANELLA, J.



COLLINS, J.