Filed 11/23/22  P. v. Allen CA4/1
Received for posting on 11/29/22

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANDREW PHILLIP ALLEN,<br><br>    Defendant and Appellant. | D079633<br><br><br><br>(Super. Ct. No. INF1901962) |

APPEAL from a judgment of the Superior Court of Riverside County, Jorge C. Hernandez, Judge.  Affirmed.

Law Office of Zulu Ali & Associates and Whitney Ali for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steven T. Oetting and Daniel John Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

Defendant Andrew Phillip Allen appeals from a judgment of conviction entered after a jury convicted him on all charges arising out of a domestic violence incident in which he punched, kicked, and choked his wife and threatened her with a firearm.

On appeal, Allen asserts three claims of error. He first contends that the trial court abused its discretion in denying his motion for judgment of acquittal. According to Allen, the prosecution failed to offer sufficient evidence that Allen's wife became unconscious during the incident or that he used a firearm to threaten her life. Allen contends that the lack of sufficient evidence supporting these two findings required his acquittal on enhancement allegations based on these findings.

Second, Allen contends that juror misconduct occurred, requiring reversal of his convictions. As support for this contention, Allen relies on a posttrial email that his wife sent to defense counsel in which she claimed that during the trial, she encountered a juror in the bathroom and the juror spoke to her, saying that the juror was not supposed to be talking to the victim.

Finally, Allen contends that the trial court erred in denying his motion for new trial, asserting in a somewhat ambiguous argument that his wife's trial testimony was unreliable and insufficient to support his convictions, and/or that his wife's posttrial statements recanting some of her trial testimony constituted new evidence warranting the granting of a new trial.

We conclude that none of Allen's contentions has merit. We therefore affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Allen and Jane Doe married in 2012. Doe began dating Allen when she was 13 years old. Doe and Allen have two children together; their daughter was 10 years old at the time of trial, and their son was 6. Doe was pregnant with the couple's third child at the time of the incident and at the time of trial.

Allen, who is six feet two inches tall and weighed about 215 pounds at the time of the incident, had a history of physically abusing Doe, who is five feet seven inches tall and weighed approximately 118 pounds at the time of the incident. In 2012, Allen attacked Doe by punching her and ripping her shirt. In 2013, Allen kicked Doe during an altercation. In 2015, Allen used a firearm to threaten Doe's life. At some point, Doe and the two children moved to Texas where they stayed in a shelter for victims of domestic violence. After Allen indicated to Doe that he "was willing to change and get it together" and that he would "keep his hands to himself," she agreed to move back to California to live with him. After moving back to California, Doe became pregnant with the couple's third child. Allen indicated that he was excited about the pregnancy.

At around 1:00 a.m. on August 20, 2019, Allen awakened Doe. He had been talking with the couple's daughter about events that had occurred while she, her brother and Doe were living in Texas, and Allen had become upset. Allen wanted to discuss with Doe an incident during which someone had apparently "grabbed [their] son by his shirt." Doe was not aware that such an incident had occurred. Allen was upset and continued to ask Doe questions while progressively becoming more agitated because he "didn't like how [Doe] was responding to the questions." At some point, Allen slapped Doe two or three times in the face in the presence of their daughter. Doe and

3

Allen continued to verbally argue for "a couple of hours." Allen repeatedly blamed Doe for the incident because she had decided to move to Texas. The argument eventually ended and everyone went to bed.

At around 6:00 a.m., Allen got up and ripped the blanket off of Doe. Allen then went into another room and started asking his daughter for more details about their time in Texas. After his daughter told him that Doe "had a guy friend" in Texas, Allen went to where Doe was sitting and kicked her in the head.

After kicking Doe, Allen began punching her with a closed fist. He punched her on the side of her body four times and on her head twice. Allen then kicked Doe's head three or four times, and Doe lost consciousness. When Doe regained consciousness, she reminded Allen that she was pregnant. Allen told her that she had "ruined [their] kids, basically." Allen then walked into the kitchen, which included a laundry area, and grabbed a bottle of bleach. He ran to Doe and was "about to get ready to pour the bleach on [Doe.]" He was "trying to drag [Doe] from [their] bedroom [by her shirt] into the bathroom to pour bleach on her." During the struggle, Allen ripped Doe's shirt off of her. Although Doe had difficulty remembering the exact chronology of events, she believed that it was around this time that Allen pressed his forearm against her throat while she was on a mattress in the bedroom. Although she stated that Allen also used his hands to choke her, she believed that she lost consciousness when he pressed his forearm against her throat.

While the abuse was occurring, the couples' children were "standing still" in the kitchen and appeared to be "in complete shock."

After Allen ripped Doe's shirt off, he went back to the kitchen and started to talk to the couple's daughter again, asking her questions such as

4

"who [Doe] was with in Texas, who did [Doe] communicate with in Texas." Doe told their daughter that it was "okay" to "[t]ell him the truth."

After Doe made this statement, Allen again became upset and started to physically attack Doe. When Doe, who was seated in a chair, tried to get up, Allen punched her in the head and knocked her down. Doe lay on the floor and curled her body into a ball. While Allen was hitting her, she lost consciousness. When she regained consciousness, Doe tried to escape out the front door, which was approximately five to six feet away from her position on the floor, but the door was locked. At this point, Allen was holding a gun and warned Doe that if she left the residence, he would kill her.[1] Doe tried to crawl through Allen's legs so that he "didn't have . . . a clear shot to shoot," but he pointed the gun down at her.[2] Allen was "furious" and said that Doe "deserved to die." Allen shoved Doe down and placed the gun on a counter. Shortly thereafter, Doe heard a female police officer knock on the door and announce her presence. Everyone "kind of froze," and then Allen "headed to the back" of the house and Doe went to "put a shirt on" before answering the door.

Doe went outside to speak with the officer who had knocked on the door. Doe had difficulty speaking because her "lips [were] really swollen and . . . [were], like, stuck to [her] braces." A different officer entered the home.

Doe initially was not honest with the police about what had happened. Doe testified that her first instinct was to try to protect Allen, and she stated

_____

[1]    Doe indicated that she did not know where Allen had "grabbed this gun from."

[2]    Doe was shown a photograph of a gun at trial and indicated that the firearm in the photograph was the firearm that Allen had pointed at her.

that she had a history of "go[ing] into, like, protect mode with him." In 2015, she was arrested and held in contempt because she did not want to testify against Allen. However, after paramedics arrived and began treating Doe, her conversation with them proved to be "a wake-up call" that convinced her to go to the hospital and to stop protecting Allen.

Doe suffered bruising to her lips and forehead. She had a black eye and her eye was swollen. Her other eye had a cut underneath it. Doe's arms, ribs, and neck were bruised, and she had scratches on her wrist.

During a sweep of the house, an officer located a loaded firearm that had a round of ammunition in the chamber.

After Allen was arrested, a deputy served him with a protective order. Allen's response to being served with the protective order was to kick a trash can, scream at the deputy and call her names, and threaten "to fight with[her] if [she] tried to do anything." Allen told the deputy that he was "done playing nice with [the deputy]." Allen called Doe 361 times while he was in custody.

In a first amended information filed February 13, 2020, the People charged Allen with one count of inflicting corporal injury on a spouse (Pen. Code,[3] § 273.5, subd. (f)(1); count 1), one count of assault with a firearm (§ 245, subd. (a)(2); count 2), one count of making a criminal threat (§ 422; count 3), two counts of child endangerment (§ 273a, subd. (a); counts 4 and 5), one count of unlawfully possessing a firearm (§ 29800, subd. (a)(1); count 6), one count of unlawfully possessing ammunition (§ 30305, subd. (a); count 7), and two counts of violating a protective order (§ 166, subd. (c)(1); counts 8 and 9).

---

[3] Further statutory references are to the Penal Code unless otherwise indicated.

6

With respect to count 1, the information alleged that Allen personally inflicted great bodily injury on Doe (§§ 12022.7, subd. (e), 1192.7, subd. (c)(8)). The information further alleged that Allen personally used a firearm (§§ 12022.5, subd. (a), 1192.7, subd. (c)(8)) with respect to count 3, and that Allen was armed with a deadly weapon (a handgun) (§ 667, subd. (e)(2)(C)(iii)) with respect to count 6. Finally, the information alleged that Allen had suffered two prior serious offenses (§ 667, subd. (a), and two strike prior offenses (§§ 667, subds. (c) & (e)(2)(A), 1170.12, subd. (c)(2)(a)).

The matter proceeded to trial before a jury. Doe testified about her history with Allen, which included previous domestic violence incidents, and she described the events of August 20, 2019 that led to the charges in this case. Responding officers testified about what they found when they responded to the scene, and investigating officers testified regarding what they learned during their investigation. A forensic nurse examiner also testified at trial. She stated that strangulation is one of the most lethal forms of domestic violence. Signs and symptoms of strangulation include neck pain, blurred vision, trouble speaking, neck swelling, and loss of consciousness. Doe indicated to the nurse during her examination at the hospital that during and after the assault, she had suffered vision changes, lost consciousness, had difficulty breathing, felt pain while breathing, was nauseous and vomited, was dizzy, had a headache, felt faint, and suffered neck pain.

One police investigator testified as a domestic violence expert. He explained that abusers commonly use intimidation to gain control over their victims. They may also use "name-calling, demeaning, belittling the victim, making statement such as 'you're lucky to have me.' "

7

At court one day, after the jurors had left, Allen told Doe that he was "not remorseful for what [he] did to [her]," and sarcastically said, " 'Good luck raising your kids.' " He called her "a punk-ass bitch" and "a whore."

Allen testified on his own behalf. He admitted that he had been arrested for a domestic violence incident in 2011, that he had punched Doe in 2012 and 2013, and that he had another physical altercation with her in 2015. Allen admitted that at around 1:00 a.m. on the day of the incident, he slapped, kicked and hit Doe when she failed to answer his questions in a way that pleased him. Allen also admitted that later in the morning, he and Doe began fighting again, and he conceded that he had pressed his forearm against Doe's neck. Allen acknowledged that he had lied to police, and that he had violated a protective order by traveling to Texas to try to find Doe. Allen further admitted that he had called Doe "a lot of times" while he was in custody, and claimed that the purpose of his calls was to "check[] on them," and "talk[] to my children, making sure that they was good. Just normal stuff."

Allen further testified that he was " 'not remorseful for what [he] did' " to Doe. He contended, however, that he had not threatened Doe with a gun, and that he never saw her lose consciousness.

The jury convicted Allen on all counts. The jury also found true the great bodily injury enhancement alleged as to count 1, as well as the firearm and deadly weapon enhancements alleged as to counts 3 and 6. The trial court found true the allegation that Allen had suffered two strike prior convictions.

Following the jury verdicts, the trial court denied Allen's motion for new trial. The court sentenced Allen to a term of 35 years to life in prison, plus an additional determinate term of 12 years.

Allen filed a timely notice of appeal.

## III.

## DISCUSSION

A. *The trial court did not err in denying Allen's motion for judgment of acquittal*

Allen asserts that the trial court erred in denying his motion for judgment of acquittal. According to Allen, there was insufficient evidence from which one could find that Doe lost consciousness or that he used a firearm to threaten Doe. These findings are related to the enhancements alleged in connection with counts 1, 3, and 6.

### 1. *Additional background*

Defense counsel did not move under section 1118.1 for judgment of acquittal immediately after the prosecution's case-in-chief. Rather, at the conclusion of the defense case, the court and the parties went "off the record." After the court stated, "Let's go back on the record . . . ," it is clear from the record that the attorneys and the court were continuing a discussion that they had started during the recess. At some point, defense counsel said, "And that reminds me, also, that I didn't make this motion after [the prosecutor] had rested, the general 11—motion." When the court reporter asked for clarification as to the motion that defense counsel was referencing, the court interjected, "1118." Defense counsel continued, "—and I would just submit." Defense counsel then began to say more about the other issue that the attorneys and the court had been discussing, which involved how to instruct the jury with respect to the personal use of a firearm allegation.

The trial court made an additional comment with respect to the personal use of a firearm issue, and then said, "In terms of your 1118 motion, the standard is substantial evidence. And I think when I look at what Ms. (Jane Doe) testified to, there's substantial evidence to support the charges. Even in the face of your client's testimony, to certain points, being

9

contrary to how she testified. But that's not the standard. The standard is[,] is there substantial evidence. [¶] So I think as to Counts 1, 2, 3, 4, 5, 6, 7, 8, and 9, I believe that there is substantial evidence to [support] th[e counts]. As to the GBI allegation under Count1, I believe there is enough substantial evidence to go to the jury. As it relates to the 422, being armed, I believe there's substantial evidence to support that. [¶] As to Count 6, which is the 29800(a)(1) with the allegation that he was armed with a deadly weapon, that one, I can't make a determination because I don't necessarily understand the allegation. And, hopefully, there will be something that will help me clarify."

2. *Legal standards*

Section 1118.1 authorizes a trial court, on its own motion or on the motion of the defendant, to enter a judgment of acquittal with respect to one or more of the charges being tried if the evidence is insufficient to support a conviction.[4]

" 'The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." ' [Citation.] 'The purpose of a motion under section 1118.1 is to weed out as soon as

---

[4]     Section 1118.1 provides in relevant part: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

10

possible those few instances in which the prosecution fails to make even a prima facie case.' [Citation.] The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.' [Citation.] The sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review. [Citation.]" (*People v. Stevens* (2007) 41 Cal.4th 182, 200.)

Under the sufficiency of the evidence standard, courts must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence [from which] a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Flores* (2020) 9 Cal.5th 371, 411.) A reviewing court should presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*Ibid.*) " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585 (*Elliott*).) "Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction." (*Ibid.*)

3. *Application*

Although Allen appeared to seek acquittal as to all of the charged counts in his motion under section 1118.1 in the trial court, on appeal Allen narrows his argument to two specific challenges to the sufficiency of the evidence. First, Allen asserts that the prosecution failed to present sufficient evidence that Doe lost consciousness during the physical assault and thus, failed to prove that Allen inflicted great bodily injury as alleged in the

11

enhancement charged in connection with count 1.  Second, he argues that there is insufficient evidence that he used a firearm as required to establish the firearm enhancement alleged in connection with count 3.

a. *Substantial evidence supports a finding that Allen rendered Doe unconscious*

A review of the record demonstrates the sufficiency of the evidence to support a factual finding that Allen rendered Doe unconscious during the attack, and in so doing, inflicted great bodily injury on Doe.  Specifically, Doe testified that she became unconscious at least three times during the attack.  Doe testified that on the morning of August 20, 2019, she lost consciousness when Allen kicked her in the head three or four times.  Doe also testified that later that morning, while she was on the bed, Allen used his forearm and hands to choke Doe until she lost consciousness.  Doe also testified that she lost consciousness when Allen hit her while she was curled up on the floor in a corner in the living room.  Doe's testimony that she lost consciousness multiple times during the attack is clearly sufficient to support the jury's finding.[5]

In an attempt to challenge Doe's credibility, Allen asserts that Doe's testimony was "inconsistent and unreliable."  However, it is not our role to second-guess the weight that the jury accorded to Doe's testimony.  It was the jury's role to consider and assess the consistency of Doe's testimony, as well as her overall credibility.  The jury was entitled to believe that portion of Doe's testimony in which she very clearly stated that she lost consciousness at least three times, even if it disbelieved other portions of her testimony.

---

[5]     Nothing that Doe described about the events underlying the charges was physically impossible or inherently improbable.  (See *Elliott, supra,* 53 Cal.4th at p. 585.)

Allen also challenges Doe's credibility by contending that Doe "admitted to lying about [Allen] to the police at the time of the incident because she was mad." In support of this argument, Allen cites to a document attached as an exhibit to his motion for a new trial—filed *after* the jury rendered verdicts of guilt—for this proposition. Allen identifies the document as an email sent by Doe to Allen's defense attorney more than a week after the jury convicted Allen, in which Doe purports to disclaim her prior assertions concerning Allen's actions, including her testimony at trial, that Allen rendered her unconscious during the incident on August 20, 2019. Statements made in an email by a witness *after trial* are irrelevant for purposes of assessing the sufficiency of the evidence to support the jury's factual findings based on evidence presented *at trial*.[6] We therefore reject Allen's contention that substantial evidence does not support the jury's finding that he inflicted great bodily injury on Doe by rendering her unconscious during the attack.

b. *Substantial evidence supports a finding that Allen used a firearm during the domestic violence incident*

Allen contends that the prosecution failed to present sufficient evidence to support a finding that he used a firearm during the commission of count 3.[7] At trial, Doe testified that Allen threatened her with a firearm.

---

[6] Further, "[i]t has long been recognized that 'the offer of a witness, after trial, to retract his [or her] sworn testimony is to be viewed with suspicion.' " (*In re Roberts* (2003) 29 Cal.4th 726, 742; see also *People v. McGaughran* (1961) 197 Cal.App.2d 6, 17 ["It has been repeatedly held that where a witness who has testified at a trial makes an affidavit that such testimony is false, little credence ordinarily can be placed in the affidavit."].)

[7] Although Allen specifies in his briefing that he is challenging the sufficiency of the evidence only with respect to the personal firearm use enhancement found true in connection with count 3, his argument regarding

She said that Allen held the firearm in his hand, pointed it at her, and told her that he was going to kill her. There is nothing inherently improbable about Doe's trial testimony, nor does her testimony describe something that is physically impossible. As a result, Doe's testimony, on its own, constitutes substantial evidence to support a finding that Allen personally used a firearm in committing the offenses for which firearm use or arming was specifically alleged. (See *Elliott, supra*, 53 Cal.4th at p. 585.) Further, responding officers located a loaded firearm in the home.

Allen again relies on Doe's posttrial email sent to his counsel to suggest that there was insufficient evidence to support a finding that Allen used a firearm, as alleged in connection with count 3. As stated with respect to the previous argument, an email sent by a witness to defense counsel after trial in which the witness makes statements that diverge from that witness's testimony is irrelevant for purposes of our assessment of the sufficiency of the evidence presented by the prosecution, *at trial*, to support a finding that Allen personally used a firearm in committing count 3, as alleged in the personal use enhancement attached to that count. We therefore reject Allen's suggestion that Doe's posttrial email undermines the sufficiency of the evidence presented at trial with respect to his personal use of a firearm.

Allen also suggests that the testimony of one of the responding officers calls into question Doe's testimony. According to Allen, the officer "testified that upon approaching the apartment . . . he never heard any statement or yelling regarding a 'gun.'" However, *even if* such testimony could be construed as calling into question the veracity of Doe's testimony that Allen

the evidence of his use of a firearm would appear to possibly apply to the armed with a deadly weapon enhancement found true in connection with count 6, as well, because the deadly weapon in the enhancement to count 6 was alleged to be a firearm.

14

threatened her with a firearm—and we are not persuaded that it can so be construed—it is the role of the jury to weigh the evidence and decide, based on that evidence, what occurred. The jury clearly believed Doe's version of events, and her testimony constitutes substantial evidence to support the jury's determination that Allen personally used and was armed with a firearm. We therefore reject Allen's challenge to the sufficiency of the evidence to support the jury's true findings on the firearm use enhancement.

B. *Allen has not demonstrated that juror misconduct occurred*

Allen contends that "communications between Jane Doe and [a] juror, during the trial, constituted jury misconduct." (Capitalization, boldface and underscoring omitted.) The entirety of Allen's argument as to how this case presents an issue of jury misconduct is as follows:

> "In this case, Jane Doe provided a declaration under penalty of perjury and wrote an email, addressed to the judge, that one of the jurors came up to her and started talking to her. [Citation.] During their conversation, the juror told Jane Doe, 'I'm not supposed to be talking to you.' [Citation.] Further inquiry was required to determine the extent of that conversation and the effects that it had on jury deliberations."

1. *Additional background*

The jury found Allen guilty on all counts on March 3, 2020. On June 17, 2020, defense counsel filed a motion for new trial. In the motion, defense counsel indicated to the court that Doe emailed him on May 12, 2020. In her email, Doe stated that she had "testified untruthfully as to losing consciousness and Mr. Allen assaulting her with a gun." Counsel further recounted that Doe stated that "a juror spoke to her in the restroom," and although "she does not say if the conversation was inappropriate, [she] does feel it was wrong."

15

Defense counsel attached a copy of the email as an exhibit to the new trial motion. In the email, Doe states "during the trial at the [courthouse] while using the restroom one of the jurors approached me in the restroom. She was an older [C]aucasian wom[a]n. She was talking to me while walking into the stall, [and] she started the conversation with 'I'm not supposed to be talking to you' so I thought it was odd that she was anyway. I didn't say anything about that at the time because I know that her talking to me was wrong." The email includes no other information about what, if anything, the juror may have said to Doe, or what Doe may have said to the juror.

At a hearing on Allen's new trial motion in which he raised the issue of Doe's posttrial email,[8] the trial court addressed the email, specifically finding that "[Doe's] statement is not credible." The court viewed Doe's email "as another instance of her making some attempt to help [Allen] out." The court also discussed Doe's statement about the juror, explaining,

> "[T]hat there was a conversation by a juror with her in the bathroom just saying 'Hi. I'm not supposed to talk to you' without more is not enough because there has to be some discussion in violation of a court order. And there was no documentation of a discussion that was had between the prospective juror and (Jane Doe) regarding any substance of the trial. They were just in the bathroom at the same time. [¶] So I find that neither one of those two things [i.e., Doe's claims that she had lied about what happened and her claim about talking to a juror in the bathroom] are in fact — or give rise to the level of granting a new trial in this case."

---

[8]    Allen, acting in pro per during some portion of the post-trial proceedings, filed multiple new trial motions.

2. *Analysis*

" 'A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors.' [Citation.] 'Juror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias.' [Citation.] Even a juror's 'inadvertent receipt of information that had not been presented in court falls within the general category of "juror misconduct." ' " (*People v. Miles* (2020) 9 Cal.5th 513, 601.)

Although Allen asserts that the purported communication between a juror and Doe in the bathroom constitutes "juror misconduct," there is no indication in Doe's description of the interaction that the juror in question actually engaged in juror misconduct.[9] " 'It is misconduct for a juror during the course of trial *to discuss the case* with a nonjuror.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1309, italics added.) " 'In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial a*bout the matter pending before the jury* is, for obvious reasons, deemed presumptively prejudicial. . . . The presumption is not conclusive, but the burden rests heavily upon the Government to establish . . . that such contact with the juror was harmless to the defendant. [Citations.]' [Citation.]" (*Ibid.*) Even if one were to take Doe's statement in her email at face value, the mere comment " 'I'm not supposed to be talking to you' " is not a comment about the case and does not itself constitute misconduct. Doe provided no other information suggesting that anything more was said. The

---

9    The fact that Allen also contends that further *inquiry* should have been made—a contention we next consider—is an indication that Allen recognizes that the evidence presented to the court was insufficient, on its own, to demonstrate that juror misconduct occurred.

17

allegation of contact between a witness and a juror, in the absence of any suggestion of communication between them about the case, is insufficient to demonstrate misconduct.

Allen also contends that the trial court should have inquired "[f]urther" regarding the "extent of [the] conversation" between Doe and the juror in the bathroom. Allen does not specify in his briefing what further inquiry he contends the court should have conducted. Although Allen does not indicate what line or lines of inquiry he contends the trial court should have pursued, there are at least two ways in which concerns about possible juror misconduct can be addressed. First, Code of Civil Procedure section 206 authorizes a defendant to petition for access to personal juror identifying information when that sealed information is "necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (Code Civ. Proc., § 206, subd. (g); see *People v. McNally* (2015) 236 Cal.App.4th 1419, 1430.) Second, a court facing contentions of juror misconduct may conduct an evidentiary hearing to further explore the issue: "[W]hen a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 415 (*Hedgecock*).)

To the extent that Allen is suggesting on appeal that the trial court should have permitted him access to personal juror identifying information, Allen fails to acknowledge that he made no effort to petition the court for such information. If Allen believed that juror misconduct had occurred and wanted to question the jurors, it was incumbent on him to petition the court for personal jury identifying information pursuant to Code of Civil Procedure section 206. A petition filed pursuant to this provision must be supported by a declaration that includes facts sufficient to establish good cause for the

18

release of the information. (Code Civ. Proc., § 237, subd. (b); see *McNally, supra*, 236 Cal.App.4th at p. 1430.) "Absent a showing of good cause for the release of the information, the public interest in the integrity of the jury system and the jurors' right to privacy outweighs the defendant's interest in disclosure." (*McNally, supra*, at p. 1430, citing *People v. Avila* (2006) 38 Cal.4th 491, 604 (*Avila*).)

"Good cause, in the context of a petition for disclosure to support a motion for a new trial based on juror misconduct, requires 'a sufficient showing to support a reasonable belief that jury misconduct occurred . . . .' " (*People v. Cook* (2015) 236 Cal.App.4th 341, 345 (*Cook*).) Additionally, the alleged misconduct must be " 'of such a character as is likely to have influenced the verdict improperly.' " (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322.) "Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported." (*Cook, supra*, 236 Cal.App.4th at p. 346.) Thus, requests for the release of confidential juror records " 'should not be used as a "fishing expedition" to search for possible misconduct . . . .' " (*Avila, supra*, 38 Cal.4th at p. 604.)

First, we reject any claim that the trial court erred in not providing Allen with personal identifying juror information because Allen did not request access to juror identifying information. He has therefore forfeited such a contention on appeal. However, even on the merits the contention would fail. Doe's statement in her email about her purported communication with a juror in the bathroom is vague and unsupported with details. The lack of a good cause showing is particularly apparent in view of the trial court's determination that Doe's email lacked credibility and appeared to be little more than an effort to help Allen after his conviction.

To the extent that Allen contends that, once provided with the information in Doe's email about her purported encounter with a juror in the

19

bathroom during trial, the court should have inquired further into potential juror misconduct and conducted an evidentiary hearing about the purported communication between the juror and Doe, we conclude that the trial court did not abuse its discretion in this respect. "[W]hen a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations." (*Hedgecock, supra,* 51 Cal.3d at p. 415.) "[H]owever, [a] defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*Ibid.*) "[A] hearing to determine the truth or falsity of allegations of jury misconduct 'should be held only when the defense has come forward with evidence demonstrating a *strong possibility* that prejudicial misconduct has occurred' " (*People v. Tran* (2022) 13 Cal.5th 1169, 1234, italics added). Given the discretion granted to a trial court with respect to whether to conduct an evidentiary hearing on the issue of juror misconduct, reversal on appeal is appropriate only where a defendant can demonstrate that the trial court abused that discretion. (*People v. Dykes* (2009) 46 Cal.4th 731, 811.)

Allen has shown no abuse of discretion in the trial court's decision not to hold an evidentiary hearing. The record discloses no evidence that demonstrates a strong possibility that prejudicial misconduct occurred. Doe's suggestion—made after Allen's conviction on all counts—that a juror encountered her in the bathroom and said, " 'I should not be talking to you' " without any suggestion that the two discussed the case, is not sufficient to raise the possibility that the juror engaged in misconduct. Further, the trial court clearly made a determination that Doe's statements in the email lacked credibility, finding that the email appeared to be solely "another instance" of Doe attempting to help Allen avoid the consequences of his criminal conduct.

20

Given these circumstances, we conclude that the trial court did not abuse its discretion in not holding an evidentiary hearing on the issue of potential juror misconduct.

C.  *The trial court did not err in denying Allen's motion for a new trial*

In a final argument, Allen contends that the trial court "erred by denying appellant's motion for new trial." (Boldface, capitalization, and underscoring omitted.) The basis for Allen's contention is unclear; although Allen sets forth legal authority regarding how a trial court is to handle questions of juror misconduct, the legal analysis includes only argument regarding challenges to Doe's credibility as a witness.[10] The entirety of this portion of the argument is as follows:

> "Specifically, the motion included the fact that Jane Doe's testimony was not only inconsistent but that she also lacked credibility. Appellant and Jane Doe have had a relationship lasting approximately 15 years and have children together. They have had a history of domestic violence between them. Jane Doe has admitted that on previous occasions, she lied to the police regarding previous altercations between them. But most importantly, she admitted that she had previously lied before to the police in order to get him in trouble. This is significant considering what was presented at the jury trial and what Appellant was sentenced to. As such, this calls into question whether Appellant had a firearm as well as whether Jane Doe went

[10]    Allen also mentions that the motion for new trial "assert[ed] witness credibility, ineffective assistance of counsel, the district attorney failing to disclose evidence, and newly discovered evidence," and further "asserted that the communication between a juror and Jane Do[e] constituted jury misconduct." While Allen cites some authority related to new trial motions based on jury misconduct and argues about Doe's lack of credibility, he does not make further mention of the additional grounds that he identifies as having been asserted in the new trial motion.

It appears from the record that Allen filed at least three motions for new trial while he was representing himself.

21

unconscious.  [¶]  The Court[ ] erred by denying Appellant's motion without taking into consideration these errors caused in depriving Appellant a fair trial."

To the extent that Allen is suggesting that Doe's trial testimony was so inconsistent that it lacked any credibility at all, such an argument is without merit.  In determining a new trial motion, the trial court "independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt to the judge, who sits, in effect, as a '13th juror.' " (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133, italics omitted.)  " 'In reviewing a motion for a new trial, the trial court must weigh the evidence independently.  [Citation.]  It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it.  [Citation.]  The trial court "should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict."  [Citation.]  [¶]  A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion.  " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' "  [Citation.]"  (*People v. Fuiava* (2012) 53 Cal.4th 622, 729–730.)

In the motion for new trial filed by defense counsel, Allen challenged the sufficiency of the evidence to support the findings that Doe lost consciousness and that Allen used a firearm to threaten her, by taking issue with Doe's testimony.  Defense counsel argued that Doe's "testimony was not credible and insufficient as to weight."  The trial court rejected this line of argument, determining that Doe's testimony was sufficiently credible on all

22

points about which she testified. It was not beyond the bounds of reason for the trial court to find Doe's testimony credible. Almost all of Doe's testimony lined up with Allen's own account of the events at issue,[11] and there was additional evidence that was consistent with Doe's statements about having suffered blows to the head and losing consciousness. The jury was shown photographic evidence of the injuries to Doe's head and face and a forensic nurse testified that Doe indicated to her shortly after the incident that she had lost consciousness during the assault. In addition, officers found a loaded firearm in the home, supporting Doe's contention that Allen threatened her with a firearm during the incident. Based on the record, the trial court did not abuse its discretion in concluding that the evidence was sufficient to support the jury's findings, not only with respect to Allen's guilt on the charged offenses, but also with respect to the enhancements.

To the extent that Allen intends to suggest that Doe's email to defense counsel constituted new evidence that calls into question the veracity of Doe's trial testimony and, therefore, undermines her credibility and requires the granting of a new trial, we disagree. Pursuant to section 1181, subdivision (8), a trial court may grant a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." "In ruling on a motion for a new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause;

_____

[11] The trial court noted during arguments on post-trial motions, "I would say if I had to give it a percentage, 85 to almost 90 percent of the testimony that both [Allen] and [Doe] gave matched up."

23

4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

"The role of the trial court in deciding a motion for new trial based upon a witness's recantation is to determine whether the new evidence is credible, i.e., worthy of belief by the jury. That determination is made after a consideration of all the facts pertinent to the particular issue. The trial court is not the final arbiter of the truth or falsity of the new evidence. [¶] Once the trial court has found the recantation to be believable, it must then decide whether consideration of the recantation would render a different result on retrial reasonably probable. [Citation.]" (*People v. Minnick* (1989) 214 Cal.App.3d 1478, 1482 (*Minnick*).) Generally, however, "the recantation of a witness should be given little credence." (*Id.* at p. 1481.) "It has long been recognized that 'the offer of a witness, after trial, to retract his sworn testimony is to be viewed with suspicion.' [Citations.]" (*In re Roberts, supra,* 29 Cal.4th at p. 742.) "[T]he trial court is in the best position to determine the genuineness and effectiveness of the showing in support of the motion [citation]." (*Minnick*, at p. 1481.)

We conclude that the trial court did not abuse its discretion in determining that Doe's attempted partial recantation of her trial testimony was disingenuous and that Doe's email did not constitute newly discovered evidence that warranted granting a new trial. Again, the trial court clearly found Doe's posttrial email to be not credible. In making this determination, the trial court considered the lengthy history between Doe and Allen, as well as evidence from telephone calls between the two that demonstrated that Allen repeatedly sought Doe's assistance to help him with his case. The court's impression was that Doe "loves" Allen, and that "she demonstrated

24

her love by lying for [Allen], by coming up with stories to try to get [Allen] out of the situation." Where, as here, the claim of newly discovered evidence is predicated on a witness's recantation that has been determined by the trial court to be unworthy of belief, there is no probability of a different result on retrial and no basis for granting the motion for new trial. (See *Delgado, supra*, 5 Cal.4th at p. 329.)

## IV.

## DISPOSITION

The judgment of the trial court is affirmed.


AARON, Acting P. J.

WE CONCUR:


IRION, J.


BUCHANAN, J.